DECISION AND ORDER
 

 JACKSON, District Judge.
 

 Terry Alan Anderson, an American journalist working in Beirut, Lebanon, was kidnapped at gunpoint from his parked automobile in West Beirut on March 16, 1985. He was imprisoned and held hostage in various dungeons in Beirut and vicinity, under execrable conditions, for nearly seven years. Released in early December, 1991, Anderson, his wife Made
 
 *109
 
 leine (“Maddy”) Bassil (a Lebanese citizen), and their daughter, Sulome (who was born in New York State in June, 1985, while her father was a hostage) now bring this action against the Islamic Republic of Iran and its Ministry of Information and Security (“MOIS”) as the principals allegedly responsible for the multiple tortious injuries done to them by the terrorist organization they employed to that purpose. Jurisdiction is predicated upon 28 U.S.C. §§ 1330(b) and 1605(a)(7), the latter a 1996 amendment to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-1611.
 

 Upon the evidence adduced at the
 
 ex parte
 
 non-jury trial before this Court February 15-16, 2000, from which the facts set forth below are found pursuant to Fed. R.Civ.P. 52(a), the Court concludes that judgments shall be given for plaintiffs.
 
 [1]
 

 I.
 

 The evidence presented at the trial establishes that in March of 1985, Terry Anderson, a thirty-eight year-old ex-Marine and seasoned combat veteran, was chief correspondent for the Associated Press (“A.P.”) for the Middle East. He had been in Beirut since the Israeli invasion of Lebanon in 1982, and had acquired a considerable understanding of the country and its myriad warring factions. Anderson was highly respected by his professional peers as a knowledgeable, resourceful, and extraordinarily well-connected reporter. Major news organizations regarded his byline stories for the A.P. as a primary source for their coverage of the region. Anderson’s next assignment for the A.P. would likely have been as chief of a major bureau or an editor in New York.
 

 While returning by automobile from an early Saturday morning tennis game on March 16, 1985, to the West Beirut apartment where he and Madeleine were living, Anderson stopped briefly to drop off his tennis partner. Anderson was quickly accosted by several young men, forced out of his car at gunpoint, and thrust onto the back-seat floor of his assailants’ vehicle. They covered him with a blanket, drove him at high speeds through the streets of Beirut to the first of many places of confinement where he was shackled and blindfolded. Anderson was to remain in chains for all but the last two weeks of his captivity.
 

 Anderson’s ordeal was typical of that of his fellow hostages described in
 
 Cicippio v. Islamic Republic of Iran, supra,
 
 n. 1. At first, Anderson was roughed-up regularly, threatened with death if he tampered with his blindfold to look at his captors, and was fed only bread, occasionally a fragment of cheese, and water. Although chained and blindfolded, Anderson became aware over the ensuing weeks that other captives were being brought in to the same enclosure, but then walled off from one another ■with wooden partitions. (Anderson later learned that among his new companions— there were ultimately five altogether— were Father William Jenco and William Buckley.) All of the captives became ill as a result of the unsanitary conditions in which they were confined, and Buckley, untreated despite the gravity of his condition, eventually died of his illness.
 

 After several months, Anderson was moved to another location and chained to a bolt in the floor, still blindfolded. Eventually, he became aware that his fellow prisoners nearby now included David Jacob-
 
 *110
 
 sen, Rev. Ben Weir, and Tom Sutherland (Dean of Agriculture at the American University). Over the next year, Rev. Weir and Fr. Jenco were released, Anderson surmises, as a result of. covert arms-for-hostages negotiations between the United States and Iran. In the meantime, the hostages were acutely aware that this particular place of captivity was in the midst of a war zone. Ordnance exploded frequently in close proximity to the structure.
 

 In time, the remaining hostages were transported by truck — wrapped from head to toe in plastic tape each time they were moved- — to yet another prison, this time a filthy dungeon with darkened cells for each prisoner, equipped only with a mattress, a water bottle, and a second container to collect urine. All the prisoners developed diarrhea; yet, being chained to the floor, they were unable to escape their own excrement.
 

 All told, Anderson estimates that he and his fellow captives were moved from cell to cell some twenty-five times. They were bound with tape each time, leaving only their nostrils exposed, then laid prone in the narrow compartments under the beds of trucks and driven around for hours while being forced to inhale the vehicles’ exhaust fumes. With each transfer they were fearful that this time their destination might be the place of their executions. Once hostages arrived at a new prison, sometimes several of them would be confined together. On other occasions they would be alone or with new cellmates. Anderson recalls that only he and Tom Sutherland were confined together throughout.
 

 For reasons he does not know, Anderson was rarely beaten, but other prisoners were, on a regular basis. Sutherland, in particular, was brutally and frequently beaten by the guards, and at one point attempted suicide. Anderson could only listen and observe, helpless to assist the victim. The guards were, however, uniformly anti-American and extremely hostile to all of the hostages, as well as indifferent to their prisoners’ discomforts: chains, blindfolds, lack of sanitation, diet, or illness. They repeatedly taunted the hostages with assurances that they would be released shortly, which the hostages soon learned were-lies.
 

 As were his fellow hostages, Anderson was subject to periodic depressions which lasted many weeks. Deprived for most of the time of any knowledge of the outside world, given minimal information about his family (he was occasionally allowed to watch their broadcast appeals for his release), and fearful that the ordeal would never end, or would end only by his death, Anderson survived day-to-day.
 

 Over the last year-arid-a-half of his captivity, Anderson’s fellow hostages were being released one or two at a time; their captors were becoming increasingly aware that, whatever had been exchanged for hostages in the past when negotiations had been clandestine, they were no longer of significant value in trade, at least publicly, to anyone. Anderson was told from the outset that he would be the last to be released, as proved to be the case. He was, as he described it, a “poster child” for his captors — a prominent American journalist, helpless at the hands of the “Islamic jihad” — and they had ascribed a barter value to him far higher than anyone was willing to pay.
 

 At the end, Anderson was confined to a cell with three others, including Sutherland, for about a year. One by one, at intervals of several months, they were released, Anderson last of all. During the final two weeks, Anderson’s captors struck off his chains for the first time. The day of his release, he was driven, after dark but still blindfolded, to a roadside rendezvous with a Syrian army team. He removed his blindfold, he recalled, and saw the stars for the first time since his capture. The Syrians drove him to Damascus where he was reunited with his wife and daughter. Altogether, they had been apart 2,454 days — over six years and seven
 
 *111
 
 months. After a period of medical treatment for Terry Anderson at the U.S. Air Force hospital in Wiesbaden, Germany, and a period of rest and recuperation in the Caribbean, the Anderson family returned to the United States.
 

 II.
 

 As Terry Anderson was being seized from his car on the morning of March 16, 1985, Madeleine (“Maddy”) Bassil, lay asleep in their apartment in West Beirut. She was thirty-five years old and seven months pregnant with their first child. She became aware that something was wrong when she awoke late in the morning to find that Terry had not returned from his tennis game. Knowing that the practice of hostage-taking had become commonplace in Beirut in recent months, her first thought was to pray that Terry had had “an accident” — anything but kidnapped. A neighbor reluctantly told her otherwise, and it was confirmed the following night by a press release from Hezbollah.
 

 Several weeks later, Maddy flew to Ba-tavia, New York, to give birth to their daughter, in Terry’s hometown with his family nearby. Sulome Theresa Anderson was born June 7, 1985. Four months later Maddy and her baby went to England to live with a sister for a time, and then she and the child took up residence in Cyprus, where they remained until Anderson was released. While in Cyprus, Maddy and Sulome visited the A.P. office in Nicosia often, sometimes to view photographs and videotapes of Anderson and the other hostages that his captors published from time to time, or to read the propaganda messages he was forced to send, and sometimes just to remind Sulome that she had a father, hopefully still alive somewhere, who might come home some day.
 
 [2]
 

 Maddy was deeply depressed, but tried (unsuccessfully) to conceal it from Sulome. From time to time she would receive telephone calls from extortionists — none connected with Anderson’s captors — who offered to procure Anderson’s release for money, or in one case for a truckload of blue-jeans. On Sulome’s birthdays she made videotapes of the child for broadcast on Lebanese television in hopes that Anderson would be allowed to watch. (He was.) As other hostages were released, the A.P. arranged for Maddy to meet with them, and from them she learned what life was like for Terry. The appearance of one former hostage, however, terrified Maddy and Sulome that Terry would be similarly debilitated when released.
 

 Anderson, Madeleine and Sulome all testified to their difficulty adjusting to life together once they reunited in December of 1991. Ultimately, according to Anderson, it took five years for them to become a relatively normal family. Anderson discovered that the psychological damage he had sustained was far greater than he had suspected. Stoic endurance and concealment of all of his emotions had become a survival technique for him during his captivity, and he found the habit hard to break; intimate communication with his reunited family came slowly. Madeleine was, at first, terrified of this stranger from whom she had been parted so long ago, and, having been both parents to Sulome for so many years, she found also it difficult to step aside from a paternal role.
 

 Sulome, now a fourteen year-old ninth-grader, remembers her mother’s loneliness and melancholy, and her own envy of friends who had fathers in residence during the period of her father’s captivity. She also recalls her total dependence on her mother while young, and her anger and resentment at her father’s assertions of
 
 *112
 
 parental authority once the family was reunited.
 

 Anderson never returned to the Associated Press, although he would have been welcomed back. He began a new career as a teacher of journalism, first at Columbia University in New York, and presently at the Scripps School of Journalism at Ohio University. The Anderson family now live in Athens, Ohio.
 

 III.
 

 The evidence is conclusive that Terry Anderson was kidnapped — and imprisoned under deplorable, inhumane conditions— by agents of the Islamic Republic of Iran, known by many names but most commonly as Hezbollah, or the “party of God.” Anderson himself could identify them as such, based upon his intimate familiarity with the warring factions in Lebanon during the 1980s. He had observed, prior to his captivity, Iranian troops in uniform training Hezbollah recruits in the Bekaa Valley. The mullahs who directed Hezbollah operations, Anderson knew, had received their religious instruction in Iran. While imprisoned, Anderson was once visited by an Iranian national who formally identified himself to Anderson as the liaison between Hezbollah and Iran. Anderson also became aware, at one point, that his place of confinement at the moment was a sub-basement of barracks occupied by troops of the Iranian Revolutionary Guard.
 

 Ambassador Robert Oakley, a career U.S. Foreign Service officer now retired, who served in Beirut in the 1970s and went on to become Director of the State Department Office of Terrorism and a leading National Security Council adviser on issues of terrorism, positively identified the Iranian Ministry of Information and Security as responsible for causing the seizure of the hostages in Lebanon by Hezbollah. He was personally aware when, in exchange for a delivery of Hawk missiles to Teheran arranged by Col. Oliver North of the U.S. National Security Council, one hostage was released. Iran, he testified, has been officially designated as a state supporter of terrorism. It financed, organized, armed, and planned Hezbollah operations in Lebanon and elsewhere.
 

 Dr. Patrick Clawson, director of research at a private public policy institute in Washington, D.C., who has studied and written about Iran for many years, testified that Hezbollah originated with Iranian sponsorship in 1982 following the Israeli invasion of Lebanon. Approximately 2000 Iranian troops from the Revolutionary Guard opened a training camp in the Be-kaa Valley, armed and trained Shi'ite recruits, and financed both its terrorist operations and the various charitable activities that attracted the Lebanese Shia population to Hezbollah and retained its loyalty.
 

 Hostage-taking, particularly of foreigners, was a principal activity of Hezbollah, he said. The motives were, among others, to secure release of its own operatives who were being held as terrorists by other governments; to discredit American and Israeli influence in the Middle East; and to dramatize to the world its willingness to take radical action in pursuit of its political objectives.
 

 According to Dr. Clawson, the Iranian Ministry of Information and Security is an Iranian government agency, a reincarnation of a pre-revolutionary organization of similar name and function under the Shah, roughly comparable to the K.G.B. of the former Soviet Union. Together with the Revolutionary Guards, MOIS coordinates multiple terrorist activities throughout the Middle East, including those of Hezbollah. With approximately 30,000 employees, it is also the largest spy service in the Middle East. Dr. Clawson testified that the Ministry’s expertise in finding sites for, and operating prisons in, undetectable locations was instrumental in enabling Hezbollah to conceal the hostages’ places of confinement in and near Beirut so effectively as to thwart any rescue attempts. Dr. Clawson estimates MOIS’ annual budget
 
 *113
 
 at between $100 million and $500 million, of which between $50 million to $100 million is expended in support of terrorist activities.
 

 IV.
 

 Plaintiffs Terry A. Anderson and Madeleine Bassil individually, and as the parents and natural guardians of Sulome T. Anderson, pray for an award of compensatory damages against the Islamic Republic of Iran and its Ministry of Information and Security.
 

 T1] Section 1605(a)(7) of the Foreign Sovereign Immunities Act of 1976 (“FSIA”), as amended, 28 U.S.C. §§ 1602
 
 et seq.,
 
 provides a cause of action against a foreign state for anyone who suffered personal injury “that was caused by an act of torture, extrajudicial killing, aircraft sabotage,
 
 hostage taking, or the provision of material support or resources ... for such an act
 
 .... ” 28 U.S.C. § 1605(a)(7) (emphasis added). Thus, the FSIA authorizes personal injury claims against a foreign state that provides material support or resources for acts of hostage-taking.
 

 This Court has previously found Iran to be a state sponsor of terrorism under § 1605(a)(7).
 
 See Flatow v. The Islamic Republic of Iran,
 
 999 F.Supp. 1 (D.D.C.1998). In
 
 Cicippio v. The Islamic Republic of Iran,
 
 18 F.Supp.2d 62 (D.D.C.1998), the Court concluded that Iran had “openly provided ‘material support or resources’ to Hizbollah, [as the kidnappers of Joseph Cicippio, Frank Reed, and David Jacob-sen] and that is sufficient grounds to impose liability under § 1605(a)(7).”
 
 Id.
 
 at 68. In the instant case the evidence once again discloses that Iran provided Hezbollah with funding, direction and training for its terrorist activities in Lebanon, including the kidnapping and torture of Terry Anderson, and his imprisonment as a hostage for 2,454 days. Iran falls within FSlA’s definition of a state sponsor of terrorism and is thus liable for the injuries suffered by plaintiffs as a result of Hezbollah’s terrorist acts.
 

 Plaintiff Terry A. Anderson seeks compensatory damages for the following causes of action: battery, assault, false imprisonment, intentional infliction of emotional distress, and loss of consortium. Each of these causes of action is authorized under § 1605(a)(7) of the FSIA.
 

 Plaintiff Madeleine Bassil, Terry Anderson’s wife, seeks compensatory damages based on causes of action of intentional infliction of emotional distress, and loss of consortium and solatium. Ms. Bassil is a Lebanese national. Although Ms. Bassil is not a U.S. citizen, the FSIA confers subject matter jurisdiction over a claim under 28 U.S.C. § 1605(a)(7) if
 
 “either
 
 the plaintiff
 
 or
 
 the victim [is] a United States national at the time of the incident.”
 
 Fla-tow,
 
 999 F.Supp. at 16 (emphasis added). Terry Anderson was a U.S. citizen at the time of his abduction. Thus, this Court has subject matter jurisdiction over his wife’s claims.
 

 Plaintiff Sulome Anderson, who is the minor daughter of Terry Anderson and Madeleine Bassil, seeks compensatory damages for loss of solatium.
 
 [3]
 
 Employing essentially the same calculus as it did in
 
 Cicippio, supra,
 
 the Court will award compensatory damages to Terry Anderson in the amount of $24,540,000; to Madeleine Bassil in the amount of $10,000,000; and to Sulome Anderson in the amount of $6,700,-000.
 

 V.
 

 The plaintiffs also pray for an award of punitive damages against the defendant Ministry of Information and Security. The tortious conduct with which both
 
 *114
 
 defendants are charged, savage and cruel by any civilized standards, would surely merit such an award. The FSIA, however, expressly exempts a foreign state from liability for punitive damages, 28 U.S.C. § 1606; see
 
 Cicippio,
 
 18 F.Supp.2d at 69. An “agency or instrumentality” of a foreign state may, however, be liable for punitive damages. The term “agency or instrumentality” includes a separate legal person or entity, which is “an organ of a foreign state,” or is owned by it. 28 U.S.C. § 1603(b). The MOIS is thus vulnerable to an award of punitive damages.
 

 The purpose of punitive damages, as the name implies, is to punish wrongful conduct — to prevent its repetition by the offender and to deter others who might choose to emulate it.
 
 See Gertz v. Robert Welch, Inc.,
 
 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The victim to whom the award is made thus stands as a surrogate for civilized society in general; the victim is made more than whole in order that others may be spared a similar injury.
 

 Yet another reason to award punitive damages in this particular case is to vindicate the interest of society at-large in the collection and dissemination of complete and accurate information about world conflicts. Two eminent journalists — Dan Rather, anchor and managing editor of
 
 CBS Evening News,
 
 and Eugene Roberts, former managing editor and foreign correspondent of the
 
 New York Times
 
 and executive editor of the
 
 Philadelphia Inquirer
 
 — testified with respect to the extent to which acts of terrorism, and in particular the kidnapping and hostage-taking of foreign correspondents, inhibit the gathering and reporting of news. Other journalists, even those such as Terry Anderson, who are accustomed to working in war zones and are undaunted by transient physical danger, are forced to exercise uncustomary caution in the presence of the threat of potential kidnapping. Newsgathering becomes at once more difficult and more costly. News organizations reduce their staffs to a minimum when their personnel are exposed to such a threat. Those who remain are intimidated. As time passes, news coverage inevitably tends to become superficial, no matter the importance of the story.
 

 It is never a simple task to calibrate an award of punitive damages to the gravity of the offense; at once sufficient to produce the desired effect, yet leaving the wrongdoer the wherewithal to continue its lawful pursuits. It is still more difficult in a case such as this, in which the likelihood that any award will ever be paid is minimal. Nevertheless, the Court concludes, on the basis of the testimony of Dr. Claw-son, that an award of thrice the MOIS’ maximum annual budget for terrorist activities, or $300 million, is the closest approximation that it can make to an appropriate award and will cause judgment in that amount to be entered accordingly against MOIS in favor of the Anderson family.
 

 It is, therefore, this 24th day of March, 2000,
 

 ORDERED, that judgment be entered in favor of the plaintiffs against the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, for compensatory damages as follows:
 

 Terry A. Anderson: $24,540,000
 

 Madeleine Bassil: $10,000,000
 

 Sulome Anderson: $6,700,000
 

 IT IS FURTHER ORDERED, that judgment be entered in favor of plaintiffs, jointly and severally, against the defendant Iranian Ministry of Information and Security for punitive damages in the amount of $300,000,000; and it is
 

 FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in accordance with the foregoing.
 

 [1]
 

 . This case is the second in a series of cases brought in this Court by U.S. citizens and their kin who were seized and held hostage in Beirut in the 1980's by the Hezbollah (or Hizballah), a politico-paramilitary organization operating in Lebanon as an agent of the Iranian government.
 
 See Cicippio v. Islamic Republic of Iran,
 
 18 F.Supp.2d 62 (D.D.C.1998).
 

 As in
 
 Cicippio,
 
 where the sole defendant was the Islamic Republic of Iran, the defendants in the instant case were properly served with process pursuant to 28 U.S.C. § 1608(a)(4) as of August 11, 1999, and were declared in default on October 29, 1999, having failed to answer or otherwise respond to the complaint.
 

 [2]
 

 . Throughout Anderson’s captivity, the Associated Press supported Maddy and Sulome. Maddy received his salary and A.P. personnel assisted United Nations efforts to get Anderson released. The A.P. bureau chief in Cyprus alerted Maddy on December 1, 1991, to his imminent release, and the A.P. flew her and Sulome to Damascus to greet him.
 

 [3]
 

 . Sulome Anderson, who was born in the United States during Terry Anderson's captivity, is a U.S. citizen. Although she was not yet born at the time of Terry Anderson’s kidnapping, she has standing to maintain a cause of action for loss of solatium.
 
 See Bonbrest v. Kotz,
 
 65 F.Supp. 138 (D.D.C.1946).