**David DALIBERTI, et al., Plaintiffs,**

v.

**REPUBLIC OF IRAQ, Defendant.**

**No. CIV. A. 96–1118 (LFO).**

United States District Court, District of Columbia.

May 25, 2001.

James Cooper–Hill, Rockport, TX, Andrew C. Hall, Miami, FL, Nelson M. Jones, III, Houston, TX, for Plaintiffs.

## MEMORANDUM OPINION

OBERDORFER, District Judge.

Four male United States citizens and their spouses brought suit against the Republic of Iraq for injuries stemming from alleged acts of torture and hostage taking. Jurisdiction arises under 28 U.S.C. § 1605(a)(7). The defendant filed a motion to dismiss, which was denied by Judge Paul Friedman's Order of May 23, 2000. *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38 (D.D.C.2000). Following the denial, defendant's counsel withdrew from the case, and the Clerk of Court entered a default against the defendant on October 16, 2000.

On November 9, 2000, plaintiffs moved for a default judgment. During a four-day ex parte bench trial, plaintiffs presented evidence to justify their judgment.[1] Plaintiffs testified in detail under oath in open court in response to questions from counsel and the Court. Based on the credible and necessarily uncontroverted material evidence presented at trial, judgment shall be entered for the plaintiffs.

## I.

Following the conclusion of hostilities between the United States and the Republic of Iraq in 1991, the four male plaintiffs resided in Kuwait, working in various civilian capacities in and around the Kuwait–Iraqi border. Clinton Hall worked clearing the desert of mines and munitions from the Kuwait side of the demilitarized zone. Kenneth Beaty was an oil rig drilling supervisor. David Daliberti and William Barloon worked together, for different employers, maintaining and overhauling aircraft in Kuwait. Although some of the plaintiffs had military experience prior to living in Kuwait, they lived and worked in Kuwait as civilians. Beginning in 1992, in separate incidents, each male plaintiff was taken into custody by Iraq government employees, and held captive in Iraq. Clinton Hall was held in Iraq for five days. David Daliberti and William Barloon, taken and imprisoned together, were held for 126 days. Kenneth Beaty was held the longest, for 205 days.

At trial, each of the former prisoners testified in detail about the conditions of their capture and confinement and the physical and psychological effect of their experience on them. Plaintiffs also presented two expert witnesses, by video deposition, to support their claims for damages. Dr. William Reid, a psychiatrist, testified that each plaintiff suffered palpable psychological damage stemming from the events related by the plaintiffs. Dr. Reid is currently a professor of psychiatry at the University of Texas Health Science Center and has authored numerous articles and books, including an article dealing specifically with victims of terrorism and hostage situations. Pls.' Ex. 4. Dr. Reid's academic background and experience, particularly his significant experience in evaluating and treating former hostages, qualify him to offer expert testimony as to the plaintiffs' mental and emotional injuries. Dr. Barry Wilbratte testified to the economic impact of the captivity on plaintiffs, specifically, their loss of past and future wages. Dr. Wilbratte holds a Ph.D. in economics from Tulane University and is the Chair of the Department of Economics at the University of St. Thomas. Pls.' Ex. 5. In federal and state courts, Dr. Wilbratte has testified about litigants' wage loss. His education and experience qualify him to testify as an expert in this case. Dr. Wilbratte considered the difference between plaintiffs' earnings from employment overseas at the time of their seizure and their diminished earnings from em-

---

1. The plaintiffs and the Court made significant efforts to ensure proper notice to defendant of all proceedings. The plaintiffs sent their pretrial brief to the Iraqi Interests Section, care of the Embassy of Algeria; it was returned stamped "refused." Pls.' Ex. 26. The Clerk of Court also effected diplomatic service, via the United States Department of State, of orders and memoranda generated by the Court. See Daliberti v. Republic of Iraq, Civ. No. 96–1118 (docket entry of March 2, 2001); Tr. 271–73. Defendant was given every possible opportunity to participate meaningfully in the trial. In the absence of defense counsel, the Court used particular care to draw the following findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence.

ployment in the United States, taking into account various economic factors.

## II.

### Clinton Hall

On the morning of October 6, 1992, Clinton Hall was supervising his crew south of the Iraqi–Kuwait border. Hall and his crew were working inside Kuwaiti territory, the border having been clearly marked with concrete markers and steel rods with flags. Hall noticed an Iraqi patrol nearing his crew, and approached them, with a United Nations officer, to inform them that they were inside the Kuwait border. The Iraqi guards insisted that Hall was inside the Iraqi border and took him into custody at gunpoint, driving him first to Basra and then to Baghdad. Tr. 101–112. The Iraqis released Hall after five days in captivity. Tr. 150.

During Hall's confinement, he lived in a small prison cell with no lights, window, water, or toilet. He was frequently denied food and water, and had only limited access to any toilet facilities. Tr. 129. Iraqi guards or officers interrogated him, in the process accusing him of espionage. At times they threatened him with physical torture, such as cutting off his fingers, pulling out his fingernails, or shocking him electrically in his testicles. He was in constant fear that he would be killed or suffer serious bodily harm. Tr. 119–122.

### Kenneth Beaty

On April 25, 1993, Kenneth Beaty was traveling in Kuwait, on his way to an oil rig owned by his employer, which was located within sight of the Iraqi–Kuwait border. He stopped at an Iraqi border checkpoint and displayed his credentials to the Iraqi border guards. The guards detained him at gunpoint and then drove him to Basra, Iraq, and later to Baghdad. While he was being transported, he was often blindfolded and held at gunpoint. Tr. 22–25.

In Baghdad, he was initially confined in a car park, converted into a prison, in a cell that had no water or toilet, and only a steel cot for a bed. Tr. 28, 32–33. After 11 days, Beaty stood trial in Iraq for espionage, and although the Iraqi court found him not guilty of espionage, it later found him guilty of illegal entry into Iraq. Beaty was sentenced to 7 or 8 years in prison, and transferred to Abu Ghreib prison in Baghdad. Tr. 36–41. There, he lived in a cell infested with vermin and shared a toilet with more than 200 other prisoners. He suffered from a heart condition but was denied adequate medical attention and medication while in prison. Tr. 44–51.

While Beaty was incarcerated, his wife, Robin, undertook to secure his release. To that end, she spoke with Iraqi officials, including the Iraqi Ambassador to the United Nations Nizar Hamdoon, and with United Nations Secretary General Boutros Boutros–Ghali. Her conversations with them established that Iraq sought either a lifting of the economic sanctions imposed by the United States or a significant humanitarian gift in exchange for her husband's release. Tr. 82–87. She succeeded in raising $5,000,000 worth of prescription medicine, water purification equipment, and other medical goods, all exempt from the sanctions or embargo, to be delivered to Iraq. Tr. 87–88. She also persuaded prominent American citizens, including former President Jimmy Carter, to write letters to Iraqi officials in support of Beaty's release. Pls.' Ex. 1.

Another prominent supporter, Senator David Boren of Oklahoma, contacted Ambassador Hamdoon to open a dialogue regarding Beaty's release. The Senator's conversations with Iraqi officials confirmed that Iraq was holding Beaty in order to exact a price for his release, either in the

form of humanitarian aid or the lifting of sanctions. Deposition of Senator David Boren ("Boren Tr."), March 17, 1997, 12–13 (Pls.' Ex. 7–F). Ambassador Hamdoon eventually informed the Senator that if he traveled to Baghdad personally, Iraq would release Beaty into his custody. Boren Tr. 15. Robin Beaty delivered the medical package she had assembled. Senator Boren himself traveled to Baghdad to support her efforts. On November 14, 1993, 205 days after Iraq initially detained Beaty, Iraq released him into Senator Boren's custody. Tr. 66–67.

**David Daliberti and William Barloon**

On March 13, 1995, David Daliberti and William Barloon were traveling in Kuwait when they mistakenly ventured across the border into Iraq. Iraqi guards seized them at gunpoint, despite the presence and protests of United Nations officials, and took them to Basra, Iraq. Tr. 179–181. The United Nations report on the incident, although it faulted the plaintiffs' judgment, nonetheless determined that the conduct of the Iraqi guards was unacceptable. United Nations Border Crossing Incident Report, June 14, 1995 (Pls.' Ex. 21). Daliberti and Barloon were taken to Baghdad, where, on trial for illegal entry into the country, an Iraqi court convicted them of that offense and sentenced each of them to 8 years in prison. They were transferred to Abu Ghreib prison in Baghdad. Tr. 197–200.

During their captivity, both initially and after they were sentenced, Daliberti and Barloon were in constant fear for their lives. They observed that their captors displayed little respect for human life. At one point, an Iraqi guard attempted to execute Barloon, but was stopped by another guard. In another incident, the vehicle transporting Daliberti struck a pedestrian at high speed, yet failed to stop. Tr. 185–188. They frequently heard other prisoners being beaten, and feared being beaten themselves. Tr. 192, 198. They suffered at times from serious medical problems while in prison, but were never promptly or adequately treated. Tr. 191–204. On a visit to the prison, Kathy Daliberti and Linda Barloon observed that their husbands had lost weight and appeared to be hopeless and despondent. Tr. 206–207, 219–220, 287–290. Like the other plaintiffs, Daliberti and Barloon were not given sufficient food, water or access to toilet facilities. Tr. 191.

During their confinement, then Congressman William Richardson entered into discussions with Ambassador Hamdoon to obtain their release. Deposition of William Richardson ("Richardson Tr."), June 26, 2000 (Pls.' Ex. 7G–2). Congressman Richardson concluded, as in the case of Kenneth Beaty, that the Iraqi government was holding Daliberti and Barloon as leverage to exact concessions from the United States government, or to obtain humanitarian aid. Congressman Richardson traveled to Iraq to meet with Ambassador Hamdoon and Saddam Hussein, who confirmed that Iraq sought tangible benefits, such as aid or the easing of sanctions, in exchange for plaintiffs' release. Richardson Tr. 11–14. Ultimately, although there is no evidence that the United States provided any such relief, Iraq released Daliberti and Barloon into the custody of Congressman Richardson, after holding them for a total of 126 days.

### III.

Although the plaintiffs were taken and held in separate incidents and for varying lengths of time, each has suffered remarkably similar effects. Hall, Beaty, Daliberti and Barloon have each been diagnosed with post traumatic stress disorder. Following their release, they exhibited marked changes in personality, such as

**24**

anger, feelings of detachment and isolation, nightmares, and insomnia. Each plaintiff has suffered significant damage to his marriage and has ongoing problems with intimacy and personal relationships. According to the testimony of Dr. Reid, these men will experience these effects for the rest of their lives.[2]

Because of their psychological damage, none of the male plaintiffs was able to continue working overseas. Although some of the plaintiffs attempted more aggressively than others to return to overseas work, each plaintiff eventually returned to the United States. Tr. 69–70, 150–153, 213–214, 277–280. Feelings of isolation and fear prevented any of them from maintaining their more lucrative overseas positions, and each has suffered financial loss because of the inability and unwillingness to do so. Dr. Wilbratte's testimony established that the male plaintiffs' past and future wage loss (reduced to present value) is as follows:

| Plaintiff | Past wage loss | Future wage loss |
| --- | --- | --- |
| Clinton Hall | $1,037,897 | $ 709,107 |
| Kenneth Beaty | $ 723,326 | $1,462,115 |
| William Barloon | $ 526,323 | $1,155,962 |
| David Daliberti | $ 710,104 | $1,878,455 |

Deposition of Barry Wilbratte, Ph.D., February 21, 2001; see also Plaintiffs' Pretrial Brief & Attached Exhibits.

The testimony of the spouse plaintiffs, supported by Dr. Reid's expert opinion, demonstrated that they have also suffered since their husbands' seizure. The psychological damage to the husbands, in each case, caused an immediate and severe deterioration of the marital relationship. The wives testified that before their husbands' capture they had been in satisfactory marriages that gave them love, companionship, and support; after their husbands

returned, their marriages became strained and distant. Tr. 89–90, 163–169, 214–223, 281–295. The Halls have divorced, and the Barloons are separated. Kenneth Beaty testified that, although he and his wife are still together, they are more "like roommates" than spouses. The Dalibertis' marriage has suffered similar effects.

## IV.

 The foregoing findings of fact lead to the following conclusions of law. The Foreign Sovereign Immunities Act (FSIA) exempts from immunity foreign sovereigns where "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources … for such an act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency …." 28 U.S.C. § 1605(a)(7).

The FSIA adopts the definitions of hostage taking and torture used in the International Convention Against the Taking of Hostages, and the Torture Victim Protection Act of 1991, respectively. Id. § 1605(e). Torture is defined as

any act, directed against an individual in the offender's custody, by which severe pain or suffering (other than pain and suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having

---

**2.** Dr. Reid testified to these conclusions in specific detail about each plaintiff. Deposition of Dr. William Reid ("Reid Tr."), March 16, 2001. He also prepared individual reports for each male plaintiff which detail his findings. Pls.' Exs. 17a, c-e.

committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Section 3(b)(1), Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 Note. Hostage taking is defined as follows:

Any person who seizes or detains and threatens to kill, to injure or to continue to detain another person (hereinafter referred to as the "hostage") in order to compel a third party, namely, a State, an international intergovernmental organization, a natural or juridical person or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offence of taking of hostages within the meaning of this Convention.

34 U.N. GAOR Supp. No. 46, at 245 (TIAS 11081). The Secretary of State of the United States designated defendant Republic of Iraq as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 on September 13, 1990. 55 Fed.Reg. 37793-01.

The FSIA, as amended, provides liability for "money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in section 1605(a)(7)." Pub.L. 104–208, Div A, Title I § 101(c) [Title V, § 589], 110 Stat. 3009-172, codified at 28 U.S.C. § 1605 note.

▮▮▮ The treatment of Clinton Hall by employees or agents of defendant, as detailed above, including holding him at gunpoint, threatening to injure him physically if he did not confess to espionage or otherwise provide information, and incarcerating him in a room with no bed, window, light, electricity, water, toilet or adequate access to sanitary facilities, constituted torture as defined by the FSIA. The defendant likewise tortured Kenneth Beaty, David Daliberti and William Barloon, as detailed in the foregoing findings, by committing acts such as placing loaded guns to their heads, depriving them of medical treatment, and incarcerating them in an environment without adequate toilet facilities. Defendant also detained plaintiffs Kenneth Beaty, David Daliberti, and William Barloon in an attempt to condition their release on the receipt of humanitarian aid and/or the lifting of sanctions or the United Nations embargo. In doing so, defendant committed the FSIA offense of hostage taking. The FSIA entitles plaintiffs Clinton Hall, Kenneth Beaty, David Daliberti and William Barloon to compensation for their mental and physical suffering—during their incarceration, since their release, and in the future—and for their wage loss and other damages. Similarly, plaintiffs Elizabeth Hall, Robin Beaty, Kathy Daliberti, and Linda Barloon, are entitled to compensation for the damages, including loss of solatium and pain and suffering, that they suffered as a result of the actions of the defendant.

▮▮▮ Plaintiffs seeks damages in excess of $100,000,000. These include past and future wage loss for the male plaintiffs, $10,000 per day for each day they were incarcerated, and damages for past and future pain and suffering, calculated on a per day basis according to each plaintiff's life expectancy. In addition, each spouse plaintiff seeks $10,000,000 for solatium. In reaching an appropriate damages award, earlier decisions awarding damages under the FSIA against foreign sovereigns for torture and hostage taking served as a benchmark. The Court considered the amounts awarded in those cases in light of the similarities and differences in the facts of each case. Beginning in 1985, Terry Anderson, David Jacobsen, Joseph Cicippio, and Frank Reed were held hostage in Iran. They were awarded, approximately, $10,000 per day for each day they were incarcerated, in addition to any lost wages they suffered. *Cicippio v. Islamic Repub-*

*lic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000). The *Anderson* and *Cicippio* cases represent the most extreme examples of torture and inhumane incarceration, where the daily conditions to which the prisoners were subjected make their survival remarkable. The experiences of the male plaintiffs here, while brutal and life-changing, were not so severe. The contrast considered, the amount awarded to the *Anderson* and *Cicippio* plaintiffs, $10,000 per day of incarceration, is reasonable and appropriate in this case. This amount alone, without a separate award for pain and suffering, is sufficient to compensate the male plaintiffs for both the suffering inflicted by the captivity itself, and for the psychological injuries experienced by them following their release. The following sets forth the time spent in incarceration and the compensation to which of them is entitled.

| | | |
|---|---|---|
| Kenneth Beaty | 205 days in prison | $2,050,000.00 |
| Clinton Hall | 5 days in prison | $ 50,000.00 |
| David Daliberti | 126 days in prison | $1,260,000.00 |
| William Barloon | 126 days in prison | $1,260,000.00 |

■■ Plaintiffs Clinton Hall, Kenneth Beaty, David Daliberti and William Barloon also deserve compensation for their loss of wages to date and the present value of their projected future wage loss, as calculated by Dr. Wilbratte and set forth above, including appropriate assumptions as to inflation, rise in productivity, job advancement, personal consumption and net earnings. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 27 (D.D.C. 1998). The Court has considered the duty of plaintiffs to mitigate their damages. Each plaintiff suffered psychological damage that made it difficult, if not impossible, to continue in the same type of overseas work that he had engaged in prior to his incarceration. The plaintiffs presented expert psychiatric testimony to support a conclusion that they have each made reasonable efforts to mitigate their damages to the extent possible, and that their failure to earn wages at previous levels is consistent with their psychological injuries.

■ The spouse plaintiffs are entitled to an award of damages for loss of the society and companionship of their husbands as a result of defendant's actions. Again, the *Anderson* and *Cicippio* cases serve as useful guidance; each spouse was awarded $10,000,000 for solatium. In those cases, the spouses lived for years while their husbands were in captivity, "never knowing if their husbands were being tortured or were even still alive." *Cicippio,* 18 F.Supp.2d at 70. In the case of Terry Anderson's wife, she gave birth to their daughter and raised her for approximately six years without her husband. *Anderson,* 90 F.Supp.2d at 111. Taking into account the length of time that the spouse plaintiffs were without the companionship and support of their husbands during their captivity, the degree of severity of their husbands' treatment, and the damage to their marriages and the suffering they have experienced since their husbands were released, Robin Beaty, Elizabeth Hall, Kathy Daliberti and Linda Barloon will each be awarded damages in the amount of $1,500,000.

To summarize, the total compensatory damages awards for all plaintiffs are as follows:

| | |
|---|---|
| Kenneth Beaty: | $4,235,441 |
| Robin Beaty | $1,500,000 |
| Clinton Hall | $1,797,004 |
| Elizabeth Hall | $1,500,000 |
| William Barloon | $2,942,285 |
| Linda Barloon | $1,500,000 |
| David Daliberti | $3,848,559 |
| Kathy Daliberti | $1,500,000 |

\*　　\*　　\*　　\*　　\*　　\*

An accompanying Order implements the decisions announced herein.

## ORDER AND JUDGMENT

For the reasons stated in the accompanying Memorandum, it is this 25th day of May, 2001, hereby

ORDERED: that judgment is entered on behalf of plaintiffs Kenneth Beaty, Clinton Hall, William Barloon, and David Daliberti, against defendant, Republic of Iraq, in the total amount of $12,823,289.00, allocated as follows: to Kenneth Beaty, $4,235,441.00; to Clinton Hall, $1,797,004.00; to William Barloon, $2,942,285.00; to David Daliberti, $3,848,559; and it is further

ORDERED: that judgment is entered on behalf of the spouse plaintiffs Robin Beaty, Elizabeth Hall, Linda Barloon, and Kathy Daliberti, against defendant, Republic of Iraq, for solatium, in the total amount of $6,000,000.00, to be allocated in the amount of $1,500,000.00 to each spouse; and it is further

ORDERED: that the Clerk of Court shall cause a copy of this Order and Judgment and the accompanying Memorandum to be translated into Arabic, with the costs of translation to be paid by the plaintiffs, and transmitted to the United States Department of State for diplomatic service on the defendant in accordance with the provisions of 28 U.S.C. § 1608(a)(4), and to the Iraqi Interests Section, care of the Embassy of Algeria, 1801 P Street, N.W., Washington, D.C. 20036.