**Ann Z. KERR, et al., Plaintiffs,**

**v.**

**The ISLAMIC REPUBLIC OF IRAN, et al., Defendants.**

**No. CIV.A. 01–1994(TPJ).**

United States District Court, District of Columbia.

Feb. 11, 2003.

**60**

Michael Lee Martinez, Crowell & Moring, L.L.P., Washington, DC, for Plaintiffs.

## DECISION & ORDER

JACKSON, District Judge.

Plaintiffs in this wrongful death case are the widow of the decedent, Malcolm H. Kerr, the children of Malcolm and Ann Kerr, his surviving sister, and the estates of Malcolm Kerr and a deceased sister.[1] Defendants are the Islamic Republic of Iran ("Iran") and the Ministry of Information and Security ("MOIS") of the government of Iran. The cause of action upon which suit is brought is the murder of Malcolm Kerr in Beirut, Lebanon, in January, 1984, allegedly committed by defendants' agents as an act of terrorism in furtherance of defendants' political objectives.

Subject matter jurisdiction is conferred upon this Court by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330(b) and 1605(a)(7). Defendants have been properly served with process pursuant to 28 U.S.C. § 1608(a)(4), and have failed to answer or otherwise respond to the complaint within the time allotted or otherwise. The Clerk of Court has entered a default, and the case has, as others have done, therefore proceeded *ex parte*. Upon the evidence presented to the Court December 17–19, 2002, and the facts found therefrom as set forth below pursuant to Fed.R.Civ.P. 52(a), for the reasons hereinafter set forth the Court concludes that judgment will be given for the plaintiffs.[2]

### I.

Malcolm H. Kerr, born in Beirut in 1931 of American parents (and thus a U.S. citizen), was appointed President of the American University of Beirut ("AUB") by its Board of Trustees in March of 1982.[3] He was at the time 51 years of age, and, in the years since his graduation from Princeton in 1953, had become a world

---

1.  All plaintiffs may therefore be deemed members of the immediate family of Malcolm H. Kerr or their estates. *See Bettis v. Islamic Republic of Iran,* 315 F.3d 325 (D.C.Cir.2003).

2.  The Court also adopts as its own (and attaches hereto as an appendix) the proposed Findings of Fact and Conclusions of Law submitted by plaintiffs' counsel at the close of the evidence.

3.  AUB was founded by American missionaries in 1866 when Lebanon was a part of the Ottoman empire. Offering a secular Western-style education to students from the entire Islamic world, it is acknowledged to be the premier institution of higher learning in the Middle East, has educated many leading citizens of Arabic countries, and in the process has become a prominent symbol, as well as a source, of American influence in the region.

renowned scholar of Arabic and Middle Eastern politics and history, for most of his career as a member of the faculty of the University of California Los Angeles ("UCLA"). Among the many attributes commending him to the AUB trustees as its President, Dr. Kerr had lived in Beirut intermittently throughout his life, had previously both studied and taught at AUB, and spoke fluent Arabic.

Malcolm Kerr and his wife, Ann, also a U.S. citizen, met at AUB where both were students in 1954, and were married in 1956 in the U.S. Dr. Kerr received his Ph.D. from Johns Hopkins in 1958 and promptly returned to AUB as a member of the faculty.[4] After post-doctoral studies at Oxford University in 1961–62, the Kerrs came home to the U.S. and Malcolm Kerr began a 20–year academic career at UCLA, ultimately serving as chairman of its Department of Political Science.

The Beirut to which the Kerrs returned to begin Malcolm Kerr's tenure as President of AUB in the summer of 1982, however, was vastly different from the tranquil city they recalled from earlier years there. Lebanon's civil war had begun in 1975, and by 1982 nearly a score of factions, secular as well as sectarian, were actively engaged in armed conflict with one another vying for political control of the country. Two months prior to Dr. Kerr's arrival on cam-

pus the Israeli army had invaded Lebanon in pursuit of Palestinian militia who had fled to Lebanon, adding to the carnage. And perhaps most daunting (although its malevolence was not yet fully manifest) the Iranian government had surreptitiously adopted a policy of employing the indigenous Shi'ite population to commit acts of terrorism against Westerners in Beirut in an effort to export the tenets of its own Islamic fundamentalist revolution to Lebanon.[5]

During Dr. Kerr's first months at AUB acts of terrorism became nearly as commonplace in Beirut as the pervasive conventional combat between factions. In April 1983 the United States Embassy in West Beirut was demolished by a suicide bomber with a truck bomb. The following October two military barracks occupied by U.S. Marines and French troops were similarly destroyed, with many lives lost.[6]

The AUB campus remained an enclave of serenity, however, until the morning of January 18, 1984, when Dr. Kerr was assassinated by gunshot wounds to the back of his head as he approached his office on the third floor of AUB's College Hall. He died instantly. The assailants, glimpsed briefly by witnesses as they fled, were described as two young men. The killers were never identified or apprehended, but although responsibility for Dr. Kerr's mur-

---

4. Two of the Kerr children, Susan and John, were born in Beirut—in 1959 and 1961, respectively—while Dr. Kerr was a young professor at AUB. A third child, Stephen, was born there in 1965 while Dr. Kerr completed a three-year leave of absence from UCLA to write a book. The last of their children, Andrew, was born in California in 1968. All are U.S. citizens.

5. Shortly before the Kerrs departed the U.S. for Lebanon, Dr. Kerr's immediate predecessor as AUB President, David Dodge, was kidnapped and held hostage (as later proved to be the case in Iran) for approximately a year.

6. Nine months after Dr. Kerr's murder, in September 1984, a substitute U.S. Embassy in East Beirut was damaged beyond repair by yet another truck bomber, also causing loss of life. By 1985 mass hostage-taking had been added to the terrorists' repertoire, and in June 1985 TWA Flight No. 847 was hijacked with seven U.S. servicemen aboard, one of whom was executed upon landing at Beirut airport. Hizbollah was implicated in each incident.

der might theoretically have been ascribed to any of the multitude of factions then battling for control of the city, according to the testimony of former U.S. Ambassador Robert Oakley, and U.S. Ambassador to Lebanon at the time, Reginald Bartholomew, U.S. intelligence agencies quickly identified the fundamentalist Islamic Shi'ite organization, Hizbollah, also sometimes known as Islamic Jihad, as the perpetrator, acting at the instigation, and with the logistical and financial support, of the Islamic Republic of Iran and MOIS.[7]

As this Court has found on many prior occasions, Hizbollah's militant operatives actually committed terrorist acts in Lebanon in the 1980's—including Dr. Kerr's murder—at the bidding of its Iranian controllers in MOIS. Originally simply a component of the Lebanese Shi'a community, Hizbollah evolved from a militia known as Amal, and was developed by MOIS as an instrument of violence, the ultimate objective being to establish Lebanon as a fundamentalist Islamic state from which all Western influence—particularly American—had been expunged. To that end Iran enlisted and trained Hizbollah recruits, financed their operations, provided their weapons and other logistical support, and gave them sanctuary as needed to enable its agents to evade capture.

This Court has repeatedly found Iran liable for terrorist acts committed by Hizbollah. *See, e.g., Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78 (D.D.C. 2002); *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128 (D.D.C.2001);

*Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998). The Court takes judicial notice of the record in those cases, and the evidentiary record in this case as well amply demonstrates that Hizbollah was directly responsible for Malcolm Kerr's murder. Not only did "Islamic Jihad" publicly take credit for it at the time, Dr. Kerr's assassination fits into a pattern of terrorist attacks perpetrated against prominent Americans by Hizbollah starting with the kidnapping of AUB's acting president, David Dodge, in 1983.[8] Following Dr. Kerr's assassination, save for suicide bombings and the hijacking murder on TWA Flight No. 847, Hizbollah reverted primarily to multiple hostage takings as its preferred terrorist tactic. From the hostage release negotiations, it became apparent that Hizbollah would seize and hold the hostages, but the duration of their captivity, however, was then dictated exclusively by Iran.

## II.

◼ Foreign states are immune from suit in the United States courts unless one of the exceptions to the FSIA, 28 U.S.C. §§ 1601–1611 applies. The so-called "Flatow Amendment" to the FSIA in 1996 authorized suits against foreign states that sponsor terrorism for:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or re-

---

**7.** Ambassador Oakley became the Director of the Office of Terrorism of the U.S. Department of State in the fall of 1984. He has testified in many trials before this Court on the relationship between Hizbollah and the Islamic Republic of Iran. *See, e.g., Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 85 (D.D.C.2002); *Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128, 132 (D.D.C.2001);

*Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107, 112 (D.D.C.2000).

**8.** As Ambassador Bartholomew observed, other than perhaps himself no more conspicuous symbol of American influence worthy of debasement was to be found in Lebanon at the time than the President of AUB.

sources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605(a)(7).[9] Dr. Kerr's murder qualifies as an extrajudicial killing [10] and this Court may entertain this claim under the FSIA if: (1) Iran has been designated a state sponsor of terrorism at either the time the incident occurred or as a result of the terrorist act in question; and (2) either Malcolm Kerr or plaintiffs were United States citizens at the time of the incident. Both of these requirements are satisfied in this case.[11]

### III.

■ Plaintiff Ann Kerr, as executrix of the estate of Malcolm Kerr, seeks compensatory damages for his wrongful death.

As the Court has previously found, Dr. Kerr was a distinguished scholar in Middle Eastern studies, and presumably, had he not been murdered, would have continued with his academic career at a salary commensurate with his stature. Indeed his services were highly valued, as evidenced by the generous salary he was paid, and numerous fringe benefits he received at AUB. Malcolm Kerr's estate is entitled to recoup the economic loss caused by his wrongful and untimely death.

Dr. Bradley R. Schiller, an expert economist, testified that the economic loss caused by Dr. Kerr's death, in terms of lost salary and benefits, was $7,642,205, and he estimated that the pension he did not live to collect would have been worth $383,091. Thus, the net total economic loss recoverable by his estate as a result of Dr. Kerr's death is $8,025,296. The Court will accordingly award compensatory damages for economic loss in that amount.[12]

**9.** In *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 87 (D.C.Cir.2002), the D.C. Circuit queried whether the plain language of the Flatow Amendment creates a federal cause of action against foreign states, noting that the amendment does not list "foreign states" among the enumerated parties against whom suit may be brought. Another judge of this district court recently responded to the court of appeals' comments in *Price* and concluded that the Flatow Amendment does provide victims of state-sponsored terrorism with a cause of action against the foreign state itself. *See Cronin v. Islamic Republic of Iran,* 238 F.Supp.2d 222 (D.D.C. 2002) (Lamberth, J.).

This construction of the Flatow Amendment is in keeping with this Court's understanding of the Flatow Amendment and comports with its own earlier decisions finding sovereign states liable for state-sponsored terrorism. *See, e.g., Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128 (D.D.C.2001); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998).

**10.** An extrajudicial killing is "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court

affording all judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1605(e)(1) (adopting the meaning given that term in section 3 of the Torture Victim Protection Act of 1991). Kerr's murder falls within the definition of an extrajudicial killing as it is clear that Kerr's murder was deliberate and premeditated and there is no evidence that it was sanctioned by any sort of judicial tribunal.

**11.** Iran was not designated a state sponsor of terrorism until January 19, 1984, one day after Malcolm Kerr was assassinated. This Court nonetheless has jurisdiction over this case because as was established at trial, Iran was designated a state sponsor of terrorism partly in consequence of its involvement in his murder. Both Ambassador Oakley and Ambassador Richard Murphy testified that Malcolm Kerr's assassination was one of many factors that justified Iran's placement on the list of states that support terrorist activity.

**12.** In calculating these figures, Dr. Schiller assumed that Dr. Kerr would have remained at AUB for an additional 13 years until he reached the average retirement age of 65.

Plaintiffs also seek monetary damages for loss of consortium and solatium, or the loss of Malcolm Kerr's society and companionship, and the mental anguish occasioned by the circumstances and prematurity of his death.[13] In computing awards for loss of consortium and solatium, the Court appropriately considers the following factors:

> (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (*i.e.* closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death.

*See Stethem v. Islamic Republic of Iran,* 201 F.Supp.2d 78, 90 (D.D.C.2002).

Malcolm Kerr's death was unforeseen, sudden, violent, egregiously malicious, and took place on the AUB campus, a place long associated by the Kerr family with peace and tranquility, as well as with pleasant family memories of two generations. Dr. Kerr's wife, four children, and surviving sister testified about the initial impact of Malcolm's murder upon their own lives. Each plaintiff has a vivid recollection of the horrific moment they first learned of it. Although none of the plaintiffs have sought professional counseling to help cope with their grief, choosing instead to rely on one another for solace, they nonetheless continue to experience intense sorrow and anguish at the remembrance of his death. The Kerrs were, and remain, an extremely close-knit family, of which Malcolm was once an integral figure as a beloved and loving husband, father, and brother. He had cultivated unique and strong relationships with both sisters, a cherished wife, and each of his children. Even 19 years after Malcolm's death, his absence is still mourned at every family milestone: the weddings of his children, for example, and the birth of each grandchild.

It is therefore, this 11th day of February, 2003,

ORDERED, that judgment be entered in favor of the plaintiffs against defendants the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, for compensatory damages as follows:

| | |
|---|---|
| Ann Z. Kerr, as executrix of the Estate of Malcolm H. Kerr: | $ 8,025,296.00 |
| Ann Z. Kerr: | $10,000,000.00 |
| Susan (Kerr) Van de Ven: | $ 3,000,000.00 |
| John M. Kerr: | $ 3,000,000.00 |
| Stephen D. Kerr: | $ 3,000,000.00 |
| Andrew S. Kerr: | $ 3,000,000.00 |
| Dorothy (Kerr) Jessup: | $ 1,500,000.00 |
| Susan Miller Muhammad, as executrix of the Estate of Marion Kerr Miller: | $ 1,500,000.00 |

It is FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in accordance with the foregoing; and it is

FURTHER ORDERED, that plaintiffs may arrange for this Decision and Order to be translated into Farsi and, at plaintiff's request, the Clerk's Office shall cause a copy of the translated Decision and Order to be transmitted to the U.S. Department of State for service upon defendants through diplomatic channels.

---

**13.** Plaintiffs have waived any claim for punitive damages.