**Thomas M. SUTHERLAND,**
**et al., Plaintiffs,**

**v.**

**ISLAMIC REPUBLIC OF IRAN, and**
**the Iranian Ministry of Information**
**and Finance, Defendants.**

**No. CIV. A. 99–3279 RCL.**

United States District Court,
District of Columbia.

June 25, 2001.

Michael Lee Martinez, Stuart Henry Newberger, Tracy A. Roman, Crowell & Moring, L.L.P., Washington, DC, for Plaintiffs.

### *MEMORANDUM OPINION*

LAMBERTH, District Judge.

On December 13, 1999, the plaintiffs, Thomas Sutherland and his family, filed a multi-count complaint alleging that the defendants were responsible for Thomas Sutherland's kidnapping, detention, and torture over a 6½ year period. The defen-

dants, despite being properly served with process, failed to answer this charge in any way. Thus, Judge Thomas Penfield Jackson entered the defendants' default on December 1, 2000.

Notwithstanding this entry of default, a default judgment against a foreign state may not be entered until the plaintiffs have "establishe[d] [their] claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). Thus, after this case was transferred to the undersigned judge, the Court held a bench trial to receive evidence from the plaintiffs. Again, the defendants failed to appear.

Based on the evidence presented in that trial, and the law applicable to this case, the Court finds a default judgment merited. Further, the Court finds that the plaintiffs are entitled to the following compensatory relief:

| | |
|---|---|
| Thomas M. Sutherland | US$ 23,540,000 |
| Jean Sutherland | US$ 10,000,000 |
| Ann Elizabeth Sutherland | US$ 6,500,000 |
| Katherine Lee Sutherland | US$ 6,500,000 |
| Joan Murray Sutherland | US$ 6,500,000 |

Finally, the Court finds that Thomas M. Sutherland is entitled to US$ 300,000,000 in punitive damages.

## I. FINDINGS OF FACT

### Introduction

1. In June 1985, Thomas M. Sutherland was serving as Dean of the Faculty of Agricultural and Food Sciences at the American University of Beirut ("AUB") in Lebanon and had held that position for approximately two years. On June 9, 1985, Professor Sutherland arrived in Lebanon from a trip to the United States and was being driven from the airport to his office at AUB when his automobile was sideswiped and stopped by another vehicle

containing eight young men carrying submachine guns. Professor Sutherland was forcibly dragged from his vehicle and kidnapped at gunpoint by members of the Hizbollah. He spent the next 2,354 days, approximately six and one-half years, imprisoned in dungeons in various parts of Lebanon, including the southern suburbs of Beirut and Lebanon's Bekaa Valley. Conditions in these dungeons were horrific and inhumane. Professor Sutherland, and the other hostages held with or near him—all by the Hizbollah—were physically and psychologically abused by their captors. Professor Sutherland was released from captivity on November 18, 1991.[1]

2. Plaintiff Thomas M. Sutherland, his wife Jean Sutherland, and their daughters, Ann Elizabeth Sutherland, Katherine Lee Sutherland, and Joan Murray Sutherland, now bring this action against the Islamic Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS"), as the principals responsible for the multiple tortious injuries done to the Sutherland family by Hizbollah, a terrorist organization financially backed and directed by Iran and MOIS. Jurisdiction of the Plaintiffs' case is based on 28 U.S.C. §§ 1330(b) and 1605(a)(7), the latter being a 1996 amendment to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611.

## Background Facts

3. Professor Thomas Sutherland was born in Scotland on May 3, 1931. He became a naturalized citizen of the United States in 1963.

4. Professor Sutherland first came to the United States in 1954 and obtained his Ph.D. from Iowa State University in 1958. While at Iowa State he married Jean Sutherland and between them they had three

daughters, Ann, Katherine (also known as "Kit") and Joan.

5. The Sutherlands also moved to Fort Collins, Colorado in 1958 and Thomas M. Sutherland became a Professor at Colorado State University specializing in various agricultural matters. In the ensuing years Professor Sutherland traveled to and had teaching assignments in other countries. For example, in 1976–78, Professor Sutherland was Director of Training for two full years at the International Livestock Center for Africa in Addis Ababa, Ethiopia.

6. In 1981, Professor Sutherland was offered the position of Dean of the Faculty of Agricultural and Food Sciences at AUB in Beirut, Lebanon. Although he had mixed feelings about leaving his post at Colorado State University, he and his wife Jean decided to go to Beirut as a team. In mid–1983, he signed a three-year contract with AUB. Initially, the Sutherlands' two youngest daughters, Kit and Joan, also went to Beirut. At the time Kit was a junior at the University of Colorado. She stayed in Beirut until mid 1984 and completed her junior year abroad at AUB. Joan stayed in Beirut until February 1984, at which time she decided to return home. The Sutherlands' oldest daughter, Ann, remained in the United States where she was completing her post-graduate education at the University of California San Francisco.

### Thomas M. Sutherland

7. Professor Sutherland decided to go to Lebanon for several reasons. He saw the post as an opportunity to advance his career in university administration. He also saw the post in Lebanon as an opportunity to teach Lebanese farmers how to

---

1. Professor Sutherland was held the second longest period of time of any Hizbollah-held hostage in Lebanon. Only Terry Anderson, who was held for at 2,454 days, exceeded Sutherland's period of captivity.

get greater productivity from land that had not been as agriculturally productive as it could have been. In addition, as Professor Sutherland testified, AUB was an outstanding institution of higher education with an excellent faculty, many of whom had trained at the best colleges and universities in the United States. Moreover, AUB's graduates typically received the best jobs in the Middle East.

8. When the Sutherlands arrived in Lebanon in mid 1983, the country was in turmoil that was effectively a state of civil war. The United States Embassy in Beirut had been bombed on April 18, 1983. Periodically bombs, shells, and sniper fire would erupt in various parts of the city. A line running roughly from north to south in Beirut, known as "the green line," separated Muslims from Christians. The Muslims were on the western side of the city, with Christians to the east. Crossing the line in either direction was sometimes dangerous and always time consuming. Not long after the Sutherlands arrived, on October 23, 1983, the United States Marine barracks near the airport south of Beirut, exploded when a suicide bomber drove an explosive-laden truck into the barracks. 241 U.S. servicemen were killed.

9. The AUB campus was an enclave on the western side of the city next to the Mediterranean Sea. The Sutherlands lived in a house on campus and, at least for the first several months they lived in Beirut, the campus was somewhat sacrosanct from the turmoil around it.

10. On January 18, 1984, however, Malcolm Kerr, President of AUB, was assassinated by a bullet fired into the back of his head just outside the elevator near his office in the AUB Administration Building.

11. These events shook and worried the Sutherlands, but they felt their mission in Beirut was important and that they, as people there to help the Lebanese, were unlikely targets for any nefarious activity. Thus, they returned for the 1984–85 school year and Professor Sutherland likewise planned to return for the 1985–86 school year to complete his contract.

12. During the 1983–85 time period, incidents of kidnapping of Americans and citizens of various Western European countries began to occur. Among those kidnapped were: William Buckley, the local Central Intelligence Agency ("CIA") station chief, kidnapped on March 16, 1984; Reverend Benjamin Weir of the Presbyterian Church, kidnapped on May 8, 1984; Father Lawrence Martin Jenco of the Catholic Church, kidnapped on January 8, 1985; Terry Anderson of the Associated Press, kidnapped on March 16, 1985; and David Jacobsen of the AUB Medical School, kidnapped on May 28, 1985. *See* Appendix III to *At Your Own Risk,* by Tom & Jean Sutherland. Pls' Exh. 92.

13. At the end of the 1984–85 academic year, Professor Sutherland flew home to Colorado on May 19, 1985, to attend Kit's college graduation from the University of Colorado, to attend a conference in California and to get a few days rest. As part of his rest, Professor Sutherland spent a few days at the family cabin just outside Estes Park, Colorado. Ann and Joan both recall a conversation at that time in which their father said he would rather die than be kidnapped, but that in any event he was not concerned because he did not see himself as a likely target.

14. Professor Sutherland returned to Beirut alone on June 9, 1985. The night before, Jean had placed in his briefcase a lengthy paper prepared by a friend on Islam, entitled *Islam Today,* that discussed various sects and aspects of Islam. The document had been formatted and printed so that its margins were "right justified." Jean thought Tom would find

the paper interesting and informative. Because Professor Sutherland did not open his briefcase during the trip from his home to Beirut, he was not aware of this paper. Unfortunately, the paper would prove to be very important to Professor Sutherland's "wellbeing." Although Professor Sutherland arrived in Beirut on June 9, he intended to remain for only a couple of weeks, as he planned to return to Colorado in time for Joan's twenty-first birthday party on July 2, 1985.

15. Upon his arrival in Beirut, Professor Sutherland was met by his driver Sharif and three bodyguards. Professor Sutherland, noting that it was only six miles to AUB, waved off the bodyguards, not believing them necessary. He and Sharif got into the front seat of Sharif's Chevrolet Caprice and left the airport, first towards the main road and then towards the coastal road that would take them north the short distance to AUB.

16. Not long after leaving the airport, two cars pulled alongside Professor Sutherland's car. Suddenly, one of the cars pulled in front of the Caprice, cutting it off. Eight armed men emerged from the two cars and began spraying submachine gun fire in various directions. Professor Sutherland was forced into one car with four of his captors and spirited off to a location in the southern suburbs of Beirut. During the ride most of Professor Sutherland's personal effects were taken from him. In southern Beirut the car stopped, and Professor Sutherland was taken out and forced into the vehicle's trunk. He was then driven for approximately ten minutes to another spot in southern Beirut. When the vehicle stopped, Professor Sutherland was removed from the trunk and he found himself standing on a concrete slab in front of a 10 or 12 story building. At that point a blindfold was placed over his eyes. This was the last

time Professor Sutherland would see the sun for six and one-half years.

17. Professor Sutherland was then taken to a double basement in what would be the first of many places he would be held captive over the ensuing six and one-half years. During the next four weeks he was held alone. Thereafter, he was moved to another location and held captive for some months with Father Jenco, Reverend Weir, Terry Anderson and David Jacobsen.

18. In these and other locations the conditions were generally horrible. Professor Sutherland was nearly always chained to the floor or to a wall, or to another hostage who was also chained to the floor or to a wall. His clothes were taken from him and at various times he was provided only a pair of boxer shorts or "Chinese pajamas" as clothing. Professor Sutherland and Terry Anderson termed one place they were held as the "Horse Stalls." They were so-named because each "cell" consisted of a steel cage with a heavy mesh ceiling. The cage was roughly six feet by two feet and Professor Sutherland could barely stand up straight inside it. In spite of the small confines, Professor Sutherland was nevertheless forced to wear a heavy rusted metal chain while caged within the Horse Stalls. Pls' Exh. 92 at 88–89.

19. Sanitation conditions were likewise horrible. Although the hostages were provided with a "urine bottle" into which they could urinate when necessary, they were permitted only one brief trip a day to the toilet facilities, regardless of whether they were ill or had a need to go more often. On some occasions even the urine bottles were taken away from the hostages as punishment. *See* Pls' Exh. 92 at 170–71. When the hostages had diarrhea or otherwise had to use the toilet facilities, they were forced to make do with what they

had, wherever they were at the time, thereby leaving them in various unhealthy and embarrassing situations. Flies, cockroaches, mosquitoes, and other bugs were always present in large numbers and were another aspect of the filthy conditions in which the hostages were forced to live.

20. Likewise, Professor Sutherland and his fellow hostages were provided with inadequate and infrequent opportunities to bathe or shower. The hostages and their clothes were frequently filthy, owing to the generally poor and inadequate conditions in which they were forced to subsist.

21. The dungeons in which the hostages were forced to live were often too hot and steamy in warm weather and too cold in the winter. In addition, the outside air flow was always poor, at best. Professor Sutherland and his fellow hostages were forced to endure months and years of these conditions with no relief from the hot weather, and insufficient blankets and clothes for the cold weather.

22. Professor Sutherland and his fellow hostages were also forced to wear their blindfolds at all times. Although they would pull them up when their Hizbollah captors were not present, any time the captors were present they insisted that the hostages wear blindfolds. At trial, Professor Sutherland demonstrated for the Court the blindfold he was wearing when he was released in 1991, *see* Pls' Exh. 90, and the manner in which he wore it.

23. Because the hostages were usually chained to the floor, a wall, and/or to another hostage, they also suffered from a lack of regular exercise. Professor Sutherland and Terry Anderson both testified about the difficulty, in many of the locations in which they were held, of moving around and getting their muscles working. Professor Sutherland's daughters testified that when he was released from captivity in 1991, Professor Sutherland had a great

deal of difficulty lifting things and standing up straight. He also had very swollen feet and had difficulty wearing shoes and walking for many months following his release.

24. Professor Sutherland and his fellow hostages also had to subsist on a bland and mundane diet consisting usually of bread, cheese, and tea. Although sometimes they were provided with fruit, the hostages generally received little variety in their diet.

25. Professor Sutherland and Terry Anderson also testified about the manner by which they were transported between dungeons in the city to those in the Bekaa Valley and vice versa. On those occasions, which took place at least a half-dozen times, Professor Sutherland and the other hostages were wrapped like mummies from head to toe in brown duct tape. They were left with only a small slit around the nose from which they were to breathe. Each were then slid under the false bottom of a transport truck, where they sometimes had to breathe the truck's exhaust for the several hour journey to their next dungeon. Upon arrival, the hostages then had the duct tape "ripped" unceremoniously from their body, which caused a great deal of pain, especially on places containing body hair.

26. Throughout his captivity, Professor Sutherland and his fellow hostages were subjected to various degrees of psychological torture and abuse. Professor Sutherland (and Father Jenco via an old audiotape) testified, for example, about one occasion in which the five hostages together in 1985—Sutherland, Anderson, Jenco, Jacobsen and Weir—had to vote on which among them would be released. Sutherland was told by his captors that he would not be released. The vote was thus between the other four. After several ballots in which Terry Anderson uniformly received four votes to David Ja-

cobsen's one vote, the hostages decided that Anderson would be the one released. Each hostage then wrote letters and otherwise prepared for Anderson's departure. The Hizbollah captors then informed the hostages that Reverend Weir would be the one released, not Terry Anderson. This experience devastated Anderson for a period of time.

27. On another occasion, according to Professor Sutherland, the Hizbollah captors came into the dungeon one evening and escorted Father Jenco out, telling him to "prepare to die." Father Jenco was taken blindfolded to the roof of the twelvestory building and again told to "prepare to die." Father Jenco said some prayers and announced, "I am ready." His Hizbollah captors ripped off his blindfold and laughed hysterically. They said to Father Jenco, "you no die, you no die" and "look, see moon." Father Jenco was taken back to his dungeon cell where, according to Professor Sutherland, he was shaking like a leaf as he retold the story to the other hostages.

28. In Professor Sutherland's case, the Hizbollah captors, in the entire six and one-half years of his captivity, permitted only two letters written by him to reach the outside world. *See* Pls' Exhs. 2, 3. Both were written in mid to late 1985, meaning that Professor Sutherland's family had no word from him in a period of more than six years. Similarly, with only two or three exceptions, no messages from Professor Sutherland's family-of which there were many—were received by Professor Sutherland in the entire time of his captivity. The only exceptions were messages printed in the local Arabic press that Jean Sutherland had published on important dates like birthdays, wedding anniversaries, Christmas, and Valentine's Day. *See* Pls' Exh. 4. Professor Sutherland testified that he was once shown such a mes-

sage with a family photograph on Valentine's Day, 1988. *See* Pls' Exh. 92 at 243. This was the first time he had learned about Simone, his granddaughter. He wondered who she was and concluded, after some thought, that Ann must have married and that Simone was his first grandchild. *Id.*

29. Importantly, however, things like the compelling 1988 video Christmas message prepared by daughters Kit and Joan, and reviewed by the Court—as well as the annual Remembrance Day and numerous other activities engaged in by the family—never reached Professor Sutherland. This lack of communication, indeed, the almost total absence of family information, was devastating to Professor Sutherland's morale, and to the hopes and spirits of his family. So total was this devastation that when Professor Sutherland was released he openly wondered to his family why they had not done anything on his behalf or tried to contact him. His family, of course, was devastated by this remark, because each had in one way or another immersed themselves in ways to keep Professor Sutherland's plight and memory alive and to obtain his early release.

30. Professor Sutherland was treated particularly badly by his Hizbollah captors because they erroneously believed he was an agent of the CIA. This ill treatment was consistent with his captors' treatment of other CIA personnel. They previously had killed hostage William Buckley in June, 1985, the same month Professor Sutherland was taken hostage. In fact, Professor Sutherland was not part of the CIA and had no association with the CIA. His Hizbollah captors nevertheless suspected he was in the CIA, because they had discovered the *Islam Today* paper that Jean Sutherland had placed in Professor Sutherland's briefcase, unbeknownst to him. The subject matter of the paper,

combined with the fact that at that time there were no word processors or computers in Lebanon that could "right justify" the margins of a document, aroused the suspicions of the Hizbollah captors.

31. When questioned about the document, Professor Sutherland denied knowing of its existence. His Hizbollah captors did not believe him, however, and began calling Professor Sutherland "kizzab, kizzab," which meant "liar, liar." Professor Sutherland's denials seemed only to fuel his captors' harassment of him. They harassed him on and off for years about being a CIA member.

32. On other occasions, the Hizbollah captors physically abused and tortured Professor Sutherland and the other hostages. In November 1986, Professor Sutherland reached his nadir as a hostage. He was brutally beaten for having been caught looking out a window at night while waiting for his turn to urinate. Upon being caught, Professor Sutherland was taken to a room and forced to lie on his back. While one Hizbollah captor held Professor Sutherland's feet up, another beat the soles of his feet with a rubber truncheon. The captors then beat Professor Sutherland from head to toe with the rubber truncheon, leaving him black and blue all over his body. *See* Pls' Exh. 92 at 170–72.

33. For the next several weeks, Professor Sutherland was kept underground in solitary confinement in total darkness, with no candle or other source of light. He was fed food in a way that left him with no idea what he was being fed or how he was to eat it. Professor Sutherland's anger and frustration with this inhumane treatment led him to attempt suicide on three occasions. He described at trial how he attempted suffocation by placing a plastic trash bag over his head and then experimenting with it to cut off the air flow. On each of the three occasions, Professor

Sutherland started feeling woozy and lightheaded. He testified, however, that each time he started losing consciousness and had reached a state of "semistupor," he had a vision of a photograph of his wife and three daughters. The photograph depicts Jean and the three Sutherland daughters with big, beautiful smiles in front of a stone fireplace. Pls' Exh. 16. That vision led him to conclude that he could not carry out his suicide. *See* Pls' Exh. 92 at 172–73.

34. From this nadir, things gradually improved, as Professor Sutherland pulled out of the depression into which he had sunk. Terry Anderson testified at trial about how low Professor Sutherland had sunk, and how hard his fellow hostages worked to "bring him back." Even so, conditions generally remained very poor and, in reality, Professor Sutherland being "brought back" only meant that he, like the other hostages, simply learned how to deal with the circumstances with which they were presented.

35. Each hostage found his own way to deal with his particular circumstances. Professor Sutherland, a native of Scotland, testified that he found great solace and comfort in the poems of Robert Burns, many of which he knew by heart. When not in solitary confinement, Professor Sutherland and his hostages attempted to deal with the unending boredom by spending hours and hours talking amongst themselves about all manner of topics.

36. In the latter years of their captivity, Professor Sutherland and the other hostages were sometimes provided with a radio, sometimes with a television, and sometimes with books. Of course, these meager and late-arriving efforts at humanity on the part of the Hizbollah captors in no way compensated for the enduring hell the hostages suffered.

37. It was clear to Professor Sutherland and the other hostages that they were being held by Hizbollah at Iran's direction. Several events pointed to this conclusion. Among other clues, the captors variously identified themselves as part of Hizbollah, the Islamic Jihad, and other organizations that Anderson and Sutherland knew were agents of Iran. In addition, throughout much of their captivity, the Iran–Iraq war was ongoing. Professor Sutherland testified that the captors' demeanor improved when Iranian troops scored a victory or were nearing Baghdad. Conversely, when there was an Iranian setback, the captors' demeanor worsened. Perhaps most tellingly, when the Ayatollah Khomeini died in June 1989, the captors went into mourning. Pls' Exh. 92 at 296. In addition, just prior to Professor Sutherland's release from captivity on November 18, 1991, the *Tehran Times* "predicted" that British hostage Terry Waite and an American hostage would be released "soon." *Id.* at 361.

38. As the trial testimony revealed, Weir, Jenco, and Jacobsen were released from captivity in 1985 and 1986 as a result of the ill-fated Iran/Contra arms for hostages deal. When that arrangement became public, the release of American hostages ceased, although citizens of the United States continued to be taken hostage. *See* Appendix III to Pls' Exh. 92. It was not until 1990 that releases of American hostages resumed, with the bulk of the hostage releases occurring in 1991.

39. Professor Sutherland was released on November 18, 1991. He was taken blindfolded to a spot in the Bekaa Valley where his blindfold was removed and he was turned over to Syrian authorities. He and Terry Waite, who was also released that day, were taken to Damascus, Syria, where they held an impromptu press conference. From there, Professor Sutherland was flown to Wiesbaden, Germany where he was given a physical and other examinations. It was in Wiesbaden that Professor Sutherland finally met up with Jean and his daughters Kit and Joan. Ann was unable to make the trip because she was nearly nine months pregnant with her second child, William.

40. Unfortunately, Professor Sutherland's release coincided with a family tragedy. Only thirty-six hours prior to his release, his father-in-law, Jean's father, died of cancer in Ames, Iowa. Professor Sutherland emotionally testified at trial that when he learned of the news, he could not have been hurt more "had he been hit with a hammer."

41. Following several days in Germany, Professor Sutherland and his family flew to San Francisco, where they met Ann and her husband Ray, and, for the first time, his granddaughter Simone. Although he picked Simone up and held her, Professor Sutherland's daughters testified that he had to brace himself to do it and that he could not hold her long, given that he had gone without regular exercise for so long. The family celebrated Thanksgiving together before Tom and Jean returned to Colorado.

42. Upon his return to Colorado, Professor Sutherland received invitations from all over the country to speak about his experience. Professor Sutherland accepted nearly every invitation he received, effectively becoming a "hostage to being a hostage."

43. Professor Sutherland was interested in resuming his career as a college administrator. He had even been told by the President of Colorado State University that he could have any job he wanted. However, when Professor Sutherland applied for administrative positions at Colorado State and other colleges and universities, he was uniformly rejected. He was given a variety of excuses for his rejection,

including one citing his lack of "knowledge of diversity." Professor Sutherland suspected that the rejections had more to do with the fact that he was in his early sixties. In fact, Professor Sutherland's six and one-half years as a hostage had destroyed his academic and administrative career. He had been pulled out of the "academic mix" at a time when he was on a clear upward trend, obliterating any future opportunities. His daughter Ann, currently a Professor at the University of Virginia, testified how advances in academia occur. She concurred that his captivity had effectively ended her father's career.

44. When no academic positions became available, Professor Sutherland and Jean returned to Beirut in 1993 to visit AUB as part of an NBC News documentary. He was denied entry to AUB, however, because he was told he was a controversial person on campus and considered "an embarrassment" to AUB.

45. With the dearth of available jobs and the inevitable drying up of demands on his time as a speaker, Professor Sutherland and Jean turned to writing a book about the experience. The book, titled *At Your Own Risk*, was published in 1996, but sales were disappointing.

46. As the foregoing details, Professor Sutherland has been permanently deprived of many things as the result of his six and one-half years as a hostage. His career was ended in its prime. He missed irreplaceable moments in his family's life, such as his daughter Ann's wedding, the birth of his first grandchild, Ann's graduation with a Ph.D., his daughter Joan's 21st birthday celebration, and his father in-law's funeral. Likewise, he missed, year after year, the regularly scheduled holidays, such as Valentine's Day, the Fourth of July, Thanksgiving, and Christmas, all of which have special meaning to close-knit families such as the Sutherlands. The family companionship he missed on those days simply cannot be replaced.

47. Although Professor Sutherland appears in many ways to have recovered from his ordeal as a hostage, it is clear to the Court that he will never completely recover from the experience. Professor Sutherland testified that he was told that it typically takes hostages a period as long as their captivity to recover psychologically from this experience. Professor Sutherland also testified that in retrospect he believed that assessment is correct. In fact, only within the last year or two has Professor Sutherland felt that he has put the terrible events of 1985–1991 somewhat behind him.

### Jean Sutherland

48. Jean Sutherland, who was born and raised in Iowa, is a citizen of the United States.

49. When Jean heard that her husband Tom had been taken hostage, her first reaction was numbness and disbelief. After telephoning her daughters and various family and friends, Jean decided that her best course was to return to Beirut. Her purpose in doing so was two-fold. First, she wanted to be closer physically to Tom and thereby hopefully be in a better posture to obtain his release. Second, she wanted to continue what she saw as Tom's and her mission at AUB. As she explained in *At Your Own Risk*, "I was there to share with Tom in carrying on the work of education that we'd gone there to do, to teach young people, to give them a chance at a life, and to make positive input into a very negative environment so that conflict could be resolved and captives released with no more being abducted." Pls' Exh. 92 at 147.

50. This choice, necessitated by Professor Sutherland's abduction, essentially re-

sulted in the Sutherland daughters losing both parents. Jean Sutherland spent the vast majority of the next six and one-half years in Beirut. She was able to attend Ann's wedding, but could stay only four days. When granddaughter Simone was born, Jean was able to spend less than twenty-four hours with Ann and Simone. She missed Ann's Ph.D. graduation. She also missed being there to offer guidance and assistance to Kit and Joan as they tried to make life-altering decisions about their careers and directions in life.

51. Even when Jean was in the United States visiting one or more of her daughters, she could not be devoted to them exclusively. As time went on, Jean became actively engaged in behind-the-scenes negotiations with political and other key figures in an effort to obtain Tom's release. She was unable to share this fact, or any details about the negotiations, with her daughters. When she was at one of their homes she often had to spend much of the time sealed off in a room on the telephone engaged in these activities. Thus, even when Jean was physically present in the United States, she could not really be there for her daughters or fully enjoy their company. This was as painful to her as to them and a guilt she still carries.

52. Jean's presence in Beirut also essentially cut her off from her daughters. Since Professor Sutherland's captivity occurred before the general availability of e-mail, Jean's only contact from Beirut with her daughters was via telephone, cable, or mail. Using the telephone was both expensive and unreliable, since the state of affairs in Lebanon made telephone service, especially with long distance calls, erratic at best.

53. In the Fall of 1985, Jean received her Ph.D. She had planned for many years to pursue a career as a professor of En-glish Literature. Professor Sutherland's abduction, however, resulted in Jean putting that dream on hold. Ultimately Jean was unable to pursue this career. She totally devoted herself to the cause of Tom's release the entire time he was captive. When Tom was released in November 1991, Jean, likewise, totally devoted herself in the ensuing years to assisting Professor Sutherland and meeting his various needs as he attempted to readjust his life to something resembling normalcy.

54. Jean testified that Professor Sutherland's captivity was very trying, emotionally and otherwise, on her and her family. She explained that for the first four years or so, she was able to deal with the situation on a fairly even keel. Eventually, however, the stress of going month after month with no end in sight began to take its toll. She began to gain weight and became increasingly depressed. Eventually she boxed up everything in the Sutherlands' Beirut house so that she could be ready to move whenever necessary.

55. Jean also suffered from what she termed "survivor's guilt"—she felt guilty about eating good food, being able to walk freely, and generally doing anything that she knew Tom was unable to do as a hostage. She had frequent "anxiety attacks." She also felt extreme guilt about having to choose between Tom's situation and their daughters and about putting the paper in his briefcase that gave him so much suffering and not being able to be in contact with him. She still carries this guilt, devoting as much time to her husband and daughters as possible since Tom's release in order to try to make up for the ways she felt she "failed them." In addition, as time wore on in the captivity years, Jean became extremely lonely, especially because she was in Beirut alone

and without any of her family support structure.

56. Jean was only able to return to the United States once or twice a year. She tried to time her trips to coincide with events such as the annual anniversary of Tom's abduction, so that she could participate in the Remembrance Day celebrations at Colorado State University that her daughters had arranged. Essentially everything she did during her husband's six and one-half years of captivity was done with the goal of getting Tom released.

57. Finances during Professor Sutherland's captivity were also a problem. Although Jean obtained a teaching job when she returned to Beirut in 1985, it was at a significantly reduced rate, approximately $1,200 per month. Although AUB continued to pay Tom's salary during his captivity, in 1987 AUB began paying Jean in Lebanese pounds, which effectively reduced her monthly salary to $80 per month. *See* Pls' Exh. 92 at 238. Thus, money was very tight for Jean throughout this period, especially with the cost of her necessary travels.

58. Shortly before Tom was released in November 1991, Jean learned from her stepmother that her father was near death. At the same time, the *Tehran Times* was reporting that an American would be released soon, along with Terry Waite. Having no assurance that the American would be Tom and having been through many previous false alarms, Jean headed for Iowa. In London at the airport, Jean learned that her father had died. Subsequently, while at the Newark airport, Jean telephoned Tom's brothers in Scotland to advise them of her father's death. At that point she learned that Tom had been released, and that Tom's brothers were en route from Scotland to Wiesbaden, Germany. Jean relayed this information to her daughters and reversed course

for Germany. Kit and Joan also made arrangements to fly to Wiesbaden. In doing so, all of them missed Jean's father's funeral, which was held a few days later in Iowa. *See* Pls' Exh. 92 at 357–58.

59. After Tom's and Jean's return to Colorado, it took considerable time—years according to Jean—for life to return to some normalcy for the Sutherlands. Jean testified about how Tom's career had been cut off, and about how her own hoped-for academic career had never gotten off the ground—all because of Tom's having been taken hostage and held for six and one-half years. She, like Tom and their daughters, testified compellingly about her loss of companionship with Tom and each of her daughters as a result of this experience.

60. Jean testified compellingly that in a real sense, the Sutherland family can never put Tom's abduction and captivity behind them, both because of the deep and lasting impact the experience had on each of them, and because Tom continues to this day always to be "former hostage Thomas Sutherland." Thus, he remains a hostage to having been a hostage.

### Ann Sutherland

61. Ann Sutherland is the oldest of the Sutherlands' three daughters. Ann is a Professor of Anatomy at the University of Virginia and lives in Charlottesville, Virginia. She is a citizen of the United States.

62. As the eldest child, Ann had an extremely close relationship with her parents, and sought their guidance on many aspects of her life. In particular, Ann and her father spent many hours discussing where she should attend college and what her career path should be. Thomas Sutherland ultimately exercised a great deal of influence over Ann's decision to pursue a career in academics.

63. Ann was twenty-six years old when her father was taken hostage. At that

time, Ann was finishing her post-graduate education at the University of California San Francisco and living in Berkeley, California.

64. Although her father's kidnapping had a devastating impact on her life, Ann felt she was forced by events to continue on with her life. When Ann graduated in 1988 with her Ph.D. in anatomy, she initially did not want to attend her graduation ceremony without her parents. Her sisters convinced Ann that it was important to attend the ceremony, even without their parents.

65. Several key events occurred in Ann's life while Thomas Sutherland was held hostage. Ann began a serious relationship with Ray Keller, whom she eventually married. Ann and Ray initially held off on getting married, because Ann did not want to have the ceremony while her father remained a hostage. When Ann became pregnant, Ann and Ray married in an informal ceremony held in a friend's backyard, thinking that they would have a larger, more traditional ceremony after her father had been released. As the years passed and her father remained a hostage, the second ceremony seemed pointless and was never held.

66. In March 1987, Ann gave birth to Simone, the Sutherlands' first grandchild. Jean Sutherland, who happened to be in the United States for a few days, was able to visit the hospital for only a few hours to meet her first grandchild before she headed back to Beirut. This visit was one of the rare occasions on which Ann saw her mother during her father's captivity. During the entire hostage crisis, Ann felt isolated from her mother. Moreover, because both her parents were absent for such a lengthy time, as the eldest daughter she became like a mother to her younger sisters.

67. Ann often felt guilty that her busy life in California prevented her from spending more time helping her sisters Kit and Joan deal with the media and organize remembrance ceremonies for their father. In particular, she struggled with feelings that she was not doing enough for her father and concern that he would feel that way. *See* Pls' Exh. 92 at 387. She also felt guilty about the fact that she was living a normal life in the United States while her father was a hostage. These feelings of guilt continue to plague her today.

68. When Ann learned in November 1991 that her father had been released, she was unable to fly to Wiesbaden with the family to meet her father because she was almost nine months pregnant with her second child. She remained in Berkeley, watching and reading media accounts of her father's release. She was reunited with her father on November 25, 1991, when the Sutherland family joined Ann and her family in Berkeley for Thanksgiving.

69. Ann saw very little of her parents in the years following her father's release. Her parents were busy traveling across the United Stated giving speeches, and as a result, Ann, like her sisters, felt isolated from them. As Ann explained at trial, in some ways it was if her father had not been released because she did not see any more of him than while he was a hostage.

70. Only recently has Ann felt that the Sutherland family has started to truly heal from her father's abduction and captivity.

### Katherine ("Kit") Sutherland

71. Kit Sutherland, the second of the Sutherlands' daughters, currently lives in Parker, Colorado. She is a citizen of the United States. Kit was twenty-four years old when her father was kidnapped. Kit, who at that time was helping a friend run a kennel in Colorado, received a phone call

from her mother, who told her that her father had been taken hostage. Kit subsequently relayed the shocking news of her father's kidnapping to her younger sister Joan, who was living with her at the time.

72. Prior to her father's kidnapping, Kit was close to both parents. Because she had spent part of her teenage years living with her parents in Addis Ababa, Ethiopia in 1976–78, Kit felt that she had developed a closer bond with her parents than had many American teenagers. Kit relied heavily on both parents for guidance and support, especially when it came to important issues such as her education and future career.

73. Kit had just graduated from the University of Colorado when her father was taken captive. At the time, Kit was trying to decide what kind of career she should pursue. Her father's kidnapping and captivity, and the subsequent media attention directed at her family, made it impossible for Kit to focus on choosing and starting a career. She essentially put her life "on hold" for the entire period of her father's captivity.

74. Of the Sutherlands' three daughters, Kit took it upon herself to represent the family vis-a-vis the media. Kit fielded countless telephone calls from the media over the six and one-half years of Professor Sutherland's captivity. She also organized events to keep her father's memory alive in Colorado and in the United States. These events included ribbon ceremonies, speeches, petitions, and meetings with politicians, such as then-Secretary General of the United Nations Javier Perez de Cueller.

75. While Kit willingly accepted her role as media spokesperson for the family, she felt that she had little time for herself and, as a consequence, was unable to find any direction in her life. As a result, she took non-career path jobs offered to her.

As Kit stated in a video Christmas message that she and Joan made for her father in captivity (which he never received), she and her sisters were "existing, but not living." See Pls' Exh. 91.

76. It was especially devastating to Kit to learn after her father's release that he had received no information during his captivity of the efforts she and her family had made to communicate with him and to keep his memory alive, and that he had wondered why his family had forgotten him (which, of course, they had not).

77. Kit, like her sisters, rarely had the opportunity to speak with her mother, who was living in Beirut and focused on assisting with the efforts to free the Beirut hostages. The loss of her mother's advice and companionship, coupled with the loss of her father, left Kit feeling extremely bereft. As detailed above, even when Jean was in the United States or "home," she had little to no time to truly be with her daughters.

78. After her father's release, Kit acted as her father's secretary, helping him deal with the thousands of letters, phone calls and invitations he received. She was dismayed that her father, even after his release, seemed a hostage to his captivity, and rarely had time to rest or spend time with his family.

79. It has only been in the last year or so that Kit has felt the Sutherland family has begun to recuperate somewhat from Professor Sutherland's years as a hostage.

### Joan Sutherland

80. Joan Sutherland is the youngest of the Sutherland children and is a citizen of the United States. She resides in Gresham, Oregon, a suburb of Portland. Joan had not yet turned twenty-one when she received the news of her father's kidnapping. Her father had planned on re-

turning from Beirut for her twenty-first birthday party on July 2, 1985. A major celebration had been planned.

81. As the youngest child, Joan had received a lot of attention and affection from both of her parents. She turned to her father for advice on all sorts of topics, from mundane issues such as car repair to more important issues, such as what sort of career she should pursue.

82. Her father's kidnapping, and the isolation from both her parents that it caused, devastated Joan. She felt lost without her father's advice, and floated through life, unable to make any major decisions. She took a number of menial jobs that held no interest for her.

83. Once, in November 1985, while Joan was attending flight attendant school in California, she was awakened early in the morning by a telephone call informing her that her father had been executed. Although this information later proved to be false, it made carrying on with the day-to-day activities of life nearly unbearable for Joan.

84. Joan helped her sister Kit deal with the media and organized remembrance ceremonies for her father, which included delivering petitions to the United Nations in New York. She too essentially put her life "on hold" while her father was a hostage. It was important to her, as it was to the other Sutherland family members, that Professor Sutherland know that his family was doing everything it could to keep his memory alive. Likewise, it was devastating to Joan to learn after her father's release that he had no knowledge of the things she and her family had been doing for him, and that he had wondered why his family had forgotten him.

85. After her father's release, Joan hoped to spend as much time as possible with her parents. Unfortunately, both parents were busy dealing with the media and traveling across the country to give speeches. Joan felt frustrated and angry that she was still isolated from her parents.

86. Like the other Sutherlands, Joan feels that even with her father's release in 1991, each of the family was, and continues to be, hostage to his having been a hostage.

87. It is only within the last year or so that Joan has felt that the family can truly relax and spend time together again as a family.

**Hizbollah And Its Iranian Support**

88. Hizbollah, which means "Party of God," was established in Lebanon in 1982, soon after the Israelis invaded southern Lebanon. Hizbollah was formed with the guidance and financial support of the government of the Islamic Republic of Iran. The Iranian government desired to establish a militant organization that would use armed force to oppose the Israeli presence in Lebanon and to counter Western influence in the country. The Iranian government, through MOIS, saw the Shiite population of Lebanon—historically at the lowest rung of Lebanese society—as an opportunity and a vehicle to gain influence in the area and thereby further Iran's various political goals.

89. Iran provided support to Hizbollah in a variety of ways. For example, two thousand soldiers from the Revolutionary Guard unit of the Iranian military set up headquarters in the Bekaa Valley to create Hizbollah. The Iranian government supplied funds, military arms, training, and supplies to Hizbollah. The Iranian government also issued propaganda to encourage Lebanese Shiites, who greatly admired Iran, to join the organization. In addition, the Iranian government helped fund Hizbollah's charitable activities, which created

a network from which Hizbollah could solicit recruits and hide its clandestine activities, such as the kidnapping of foreign nationals.

90. In the early 1980s it was well-known that Iran was providing funding and other support to the Hizbollah party. Indeed, as a recruiting technique, Hizbollah itself went out of its way to emphasize how much support it was receiving from Iran.

91. Hizbollah had used several names in its terrorist campaign, including the Islamic Jihad, the Palestinian Jihad, and the Revolutionary Justice Organization.

92. Since its inception, Hizbollah has engaged in a variety of terrorist activities to make its message known to the world, including the kidnapping of foreign nationals. Hizbollah's goals in kidnapping foreign nationals included securing the release of terrorists imprisoned in Kuwait and other locations, driving Westerners out of Lebanon, and publicizing its political causes. In seizing the various American hostages Hizbollah seized in the 1980s, the idea was to strike at interests of the United States by seizing a hostage from various American institutions. Thus, for example, Hizbollah kidnapped, among others, a Catholic priest (Jenco), a Presbyterian minister (Weir), an Associated Press reporter (Anderson), an official of the AUB Hospital (Jacobsen) and a Dean of Agriculture at AUB (Sutherland).

93. Hizbollah, funded by MOIS and Iran, was responsible for the kidnapping and captivity of Thomas Sutherland.

94. MOIS is an Iranian government organization which was formally established by law in 1983, but which appears to be an outgrowth of the secret police under the former Shah of Iran. During the Shah's reign, the organization was called the Organization for Information and Security.

95. MOIS currently has about 3,000 employees, and is the largest spy service in the Middle East. MOIS is responsible for coordinating Iran's terrorist activities. MOIS has many institutional links with the Revolutionary Guards.

96. Since the 1980s, MOIS has worked closely with Hizbollah to support its terrorist activities in Lebanon. For example, MOIS assisted Hizbollah in collecting information about potential kidnapping targets and planning the prison networks to hold the kidnapping victims.

97. Iran currently spends approximately $100 million per year or more on terrorist activities.

## II. CONCLUSIONS OF LAW

Based on the events described above, the plaintiffs make the following claims:

A. Thomas M. Sutherland sues The Islamic Republic of Iran and the Iranian Ministry of Information and Security for (1) battery, (2) assault, (3) false imprisonment, (4) loss of consortium, and (5) intentional infliction of emotional distress.

B. Jean Sutherland sues The Islamic Republic of Iran and the Iranian Ministry of Information and Security for (1) loss of consortium, (2) intentional infliction of emotional distress, and (3) loss of solatium.

C. Ann Elizabeth Sutherland, Katherine Lee Sutherland, and Joan Murray Sutherland sue The Islamic Republic of Iran and the Iranian Ministry of Information and Security for (1) loss of solatium.

Complaint, Dec. 13, 1999, at 11–14. The Court is therefore faced with the following three questions, which it answers in the order presented:

(1) Are the Islamic Republic of Iran and the Iranian Ministry of Information

(2) If not immune, are The Islamic Republic of Iran and the Iranian Ministry of Information and Security liable under the claims alleged?; and

(3) If the defendants are found liable, to what damages are the plaintiffs' entitled?

## A. Foreign Sovereign Immunity [2]

The Foreign Sovereign Immunities Act ("FSIA") grants foreign states immunity from liability in United States courts. *See* 28 U.S.C. § 1602 *et seq.* In 1996, however, Congress specifically suspended this immunity for personal injuries "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act."[3] 28 U.S.C. § 1605(a)(7). The injurious act (or the provision of resources in support thereof), to give rise to liability, must be committed by "an official, employee, or agent of a foreign state, while acting within the scope of his or her office." 28 U.S.C. 1605(a)(7).

■ The Court first finds that, based on the evidence presented at trial and recounted above, Thomas M. Sutherland was taken hostage and tortured within the meaning of 28 U.S.C. § 1605(a)(7). That Mr. Sutherland was taken hostage and detained for over six years is, of course, patently undeniable. With respect to torture, the Court finds that the deprivation of adequate food, light, toilet facilities, and medical care for over six years amounts to torture within the meaning of section 1605(a)(7).[4] Moreover, there is at least one specific instance of outright physical torture, when Sutherland was beaten with a rubber hose. *See* Tr. at 199–203 (explaining living conditions and physical treatment).

■ The Court next finds that, based on the evidence presented at trial and recounted above, Mr. Sutherland's kidnapping and torture were committed by agents of the Islamic fundamentalist group Hizbollah. This conclusion is supported by the testimony of several witnesses. For example, Sutherland's co-hostage, Terry Anderson, testified that their captors were "very, very pro-Iranian," and that Iranian Revolutionary Guards were involved in the kidnapping and detention of the hostages. *See* Tr. at 116. Anderson further testified

---

**2.** In cases such as this one, courts have sometimes referred to the immunity issue as a jurisdictional issue. *See, e.g., Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 105 (D.D.C.2000). In FSIA cases, they are one in the same. As the Supreme Court explained: "Under the [FSIA], a foreign state is presumptively *immune* from the *jurisdiction* of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (emphasis added).

**3.** Although this statute was passed after the events described in this case, Congress explicitly made the statute applicable to pre-enactment conduct. *See* Pub.L. No. 104–132, § 221(c) (stating that the statute "shall apply

to any cause of action arising before, on or after the date of enactment of this Act"). *See also Flatow*, 999 F.Supp. at 13.

**4.** From a statutory construction perspective, "torture", as used in the context of 28 U.S.C. 1605(a)(7), must have a meaning independent of "hostage taking". *See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (holding that terms in the same legislative provision should be interpreted so as to give each term its own independent meaning). Thus, the pains normally attendant to being a hostage, most notably the loss of liberty and contact with loved ones, although clearly *tortuous* within the common meaning of the term, cannot qualify as torture under 28 U.S.C. 1605(a)(7).

that he and his cohostages knew that they were being held in Hizbollah territory, and at one point, were even held at Hizbollah headquarters. *See* Tr. at 116. Moreover, several years after his release, Anderson interviewed the secretary general of Hizbollah who as much as admitted to the kidnappings. *See* Tr. at 118. Sutherland also testified as to the identity of his captors. The captors, according to Sutherland, were clearly part of an Islamic Jihad group, who, when the death of the Ayatollah Khomeini was reported, wept quite openly. *See* Tr. at 238.

Perhaps that most persuasive evidence that Sutherland's captors were members of Hizbollah came from Ambassador Robert Oakley and Dr. Patrick Clawson. Oakley, a former advisor to the National Security Council on Middle East affairs, testified bluntly on this subject. Consider the following colloquy from trial:

Q. Is there any doubt in your mind [Ambassador Oakley] that through that period of 1985 through 1991 that the Hizbollah, backed by Iran, financially and otherwise, was holding Tom Sutherland as a hostage?

A. No, there [is] none.

*See* Tr. at 21. Dr. Patrick Clawson, an experienced researcher and writer on Iranian politics, testified similarly. When asked by the Court whether Sutherland was "initially seized by Hizbollah ... and held by them throughout the time?", Clawson responded "Yes, your Honor." Tr. at 58.

Further support for the conclusion that Sutherland was captured and detained by Hizbollah is provided by precedent. For instance, in *Anderson v. The Islamic Republic of Iran*, 90 F.Supp.2d 107, 113 (D.D.C.2000), the Court found that Terry Anderson, Sutherland's co-hostage for almost his entire captivity, was captured by Hizbollah and that "Iran provided Hizbollah[5] with funding, direction and training for its terrorist activities in Lebanon, including the kidnapping and torture of Terry Anderson." *See also Cicippio v. The Islamic Republic of Iran*, 18 F.Supp.2d 62, 68 (D.D.C.1998) (finding that Hizbollah was responsible for the kidnapping and detention of David Jacobson, a co-hostage of Sutherland and Anderson).

In addition to finding that Sutherland was seized by Hizbollah, the Court also finds that The Islamic Republic of Iran and the Iranian MOIS provided "material support or resources" to Hizbollah within the meaning of 28 U.S.C. § 1605(a)(7). The most persuasive testimony on this issue came from Sutherland's experts, Ambassador Oakley, Robert McFarlane, and Dr. Clawson. Ambassador Oakley testified that "radical elements highly placed within the government of Iran are giving operational policy advice to terrorists in Iran, specifically terrorists operating under the name Islamic Jihad or Hizbollah." Tr. at 19. Similarly, Robert McFarlane, former National Security Advisor, testified that Hizbollah was a "terrorist group ... formed in the early 1980s under the sponsorship of the government of Iran." Tr. at 29; *see also* Tr. at 31 (opining that Hizbollah was formed with the "volunteering of [Iranian] financial support" as well as "Iranian personnel"). Finally, Dr. Clawson testified that the Iranian government and the Iranian MOIS were behind the formation and funding of Hizbollah, and that Hizbollah is very much under the control of the Iranian government. *See* Tr. at 41–42.

5. There does not appear to be a consensus on the spelling of "Hizbollah", as it is often spelled "Hezbollah" as well.

Iran's provision of material support to Hizbollah is further supported by the weight of precedent. In a case similar to this one, Judge Kotelly of this Court opined: "it is now the universally held view of the intelligence community that Iran was responsible for the formation, funding, training, and management of Hizbollah." *Higgins v. The Islamic Republic of Iran,* Civ. A. No. 99–377 (D.D.C.2000). As well, Judge Jackson declared in *Anderson* that the defendants "financed, organized, armed, and planned Hizbollah operations in Lebanon and elsewhere." *Anderson,* 90 F.Supp.2d at 112; *see also Flatow v. The Islamic Republic of Iran,* 999 F.Supp. 1, 18 (D.D.C.1998) (Lamberth, J.) (finding that The Islamic Republic of Iran and the Iranian MOIS were liable under the doctrine of *respondeat superior* for the terrorist acts of the Palestine Islamic Jihad, whose source of funding was the government of Iran); *Eisenfeld v. The Islamic Republic of Iran,* 2000 WL 1918779 (D.D.C.2000) (stating that "there is no question that Hamas, [an organization quite similar and related to Hizbollah] received massive material and technical support from the ... Islamic Republic of Iran").

\* \* \* \* \* \*

In summary, the Court finds that Thomas Sutherland was taken hostage and tortured by the Islamic fundamentalist group Hizbollah. The Court further finds that the defendants, The Islamic Republic of Iran and the Iranian MOIS, "provi[ded] ... material support or resources ... for [these] acts." 28 U.S.C. § 1605(a)(7). The Court also finds that the provision of resources was an act committed by "an official, employee, or agent of a foreign state, while acting within the scope of his or her office." 28 U.S.C. 1605(a)(7). Based on these findings, the Court therefore concludes that the defendants are not immune from liability in this Court.

## B. Liability

Under 28 U.S.C. § 1606, a "foreign state ... not entitled to immunity ... shall be liable in the same manner and to the same extent as a private individual under like circumstances." Applying standard rules of liability, the Court finds the defendants liable on all counts alleged in the plaintiffs' complaint. In making that conclusion, the Court applies federal common law. *See Flatow v. The Islamic Republic of Iran,* 999 F.Supp. 1, 14–15 (D.D.C.1998) (choosing federal common law after a federal choice of law analysis).

■ It should be stressed at the outset that the liability determination is *separate and distinct* from the immunity determination. Thus, even though the defendants have been found to have tortured Sutherland—and therefore are not immune from suit—it does not therefore follow that they have automatically committed the tort of battery. Of course, in practice, this is quite often the case. However, failing to separately address immunity and liability has serious consequences and should be avoided. First, conflating the two issues obscures the correct legal analysis. This is turn creates confusing and misleading precedent, which eventually leads to wrong decisions. This case, and the several like it which have been decided in this district, will stand as the bedrock for a body of law that, depending on the future of international relations, may very well become its own specialty. As such, it is essential that the founding precedent consist of well enunciated standards which are applied with a high degree of exactitude. Second, and perhaps most importantly, the legitimacy of a domestic judicial decision in the international arena is directly related to the perceived fairness of the decisionmak-

ing process. A court that does not openly announce the rule of law it is applying will be perceived as less than fair, and therefore illegitimate. Indeed, the failure to explicitly announce the rule of law in cases like this might create a suspicion that the court is engaging in jingoism rather than justice. This most assuredly is not the case, and a structured, transparent analysis is essential to dispelling such notions.

### 1. Battery

■ According to the Restatement (Second) of Torts, a defendant has committed battery if "he acts intending to cause a harmful or offensive contact with [a] person", and a "harmful contact with the person ... .directly or indirectly results." Restatement (Second) of Torts, § 13 (1965); *see also Sphere Drake Ins. P.L.C. v. D'Errico,* 246 F.3d 682, 2001 WL 135670, at *2 (10th Cir.2001); *United Nat. Ins. Co. v. Penuche's, Inc.,* 128 F.3d 28, 32 (1st Cir. 1997).

Based upon the evidence presented in open court, the Court finds that Thomas Sutherland suffered harmful contact. Sutherland himself testified as to his repeated rough treatment, of which the most egregious instance seemed to be his beating with a rubber hose. *See* Tr. 100, 202–03. These acts, which were intentionally committed by Sutherland's captors, are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section II.A. As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

Thus, finding that Thomas Sutherland did indeed suffer a harmful contact, and that the acts causing such contact were attributable to the defendants, the Court finds the defendants liable for the battery of Sutherland.

### 2. Assault

■ According to the Restatement (Second) of Torts, a defendant has committed an assault if "he acts intending to cause a harmful or offensive contact with [a] person, or an imminent apprehension of such a contact" and the person is "thereby put in such imminent apprehension." Restatement (Second) of Torts, § 21 (1965); *see also Truman v. U.S.,* 26 F.3d 592, 596 (5th Cir.1994); *Manning v. Grimsley,* 643 F.2d 20, 22 (1st Cir.1981).

Based upon the evidence presented in open court, the Court finds that Thomas Sutherland was put in an imminent apprehension of harmful or offensive conduct. Sutherland lived for over six years in an environment where, at any moment, he might find himself harassed or beaten for virtually no reason at all. In this sense, it is not a gross exaggeration to suggest that Sutherland withstood a continuous 6–year tortious assault. But the Court need not venture such a holding, there is ample evidence from Sutherland's testimony as to specific incidents that qualify as an assault. The most exemplary of these was Sutherland's kidnapping. During that event, Sutherland's car was side-swiped, forced to stop, and then surrounded by several men with machine guns. The men proceeded to shoot randomly in the air, as well as shoot various parts of Sutherland's car, such as the tires and radiator. *See* Tr. at 194. Further, once Sutherland was forced into his captors' car, a gun barrel was pushed into the nave of his neck and he was told "No looking! I blow your head off you looking!" Tr. at 194. The Court has no hesitation in finding that these events are assaults within the definition

used by the Restatement (Second) or Torts.

These assaults, which were intentionally committed by Sutherland's captors, are attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section II.A. As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

Thus, finding that Thomas Sutherland did indeed suffer many assaults, and that the tortious acts were attributable to the defendants, the Court finds the defendants liable for the assault of Sutherland.

### 3. False Imprisonment

■ According to the Restatement (Second) of Torts, [a]n actor is subject to liability to another for false imprisonment if

(a) he acts intending to confine [a person] within boundaries fixed by the actor, and

(b) his act directly or indirectly results in such a confinement of the other, and

(c) the other is conscious of the confinement or is harmed by it.

Restatement (Second) of Torts, § 35 (1965); *King v. Crossland Sav. Bank,* 111 F.3d 251, 255 (2nd Cir.1997); *Richardson v. U.S. Dept. of Interior,* 740 F.Supp. 15, 26 (D.D.C.1990).

There is no question in the Court's mind, or anyone else's for that matter, that Thomas Sutherland was falsely imprisoned by Hizbollah for 2,354 days. Further, this imprisonment is attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section II.A. As such, the defendants are lia-

ble under the tort doctrines of *respondeat superior* and joint and several liability. *See Flatow,* 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

Thus, finding that Thomas Sutherland was indeed falsely imprisoned, and that the tortious act is attributable to the defendants, the Court finds the defendants liable for the false imprisonment of Sutherland.

### 4. Intentional Infliction of Emotional Distress

■ According to the Restatement (Second) of Torts, "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." Restatement (Second) of Torts, § 46 (1986); *see also Holbrook v. Lobdell–Emery Mfg. Co.,* 219 F.3d 598, 600 (7th Cir.2000); *Ross v. Saint Augustine's College,* 103 F.3d 338, 343 (4th Cir.1996).

Like the previous claims, the Court has little hesitation in finding that Thomas Sutherland suffered severe emotional distress at the hands of his captors, Hizbollah. The conduct of Hizbollah, in taking someone hostage for over six years, is well neigh extreme and outrageous. Further, the intent to cause such suffering was shown in the repeated bullying of Sutherland over his supposed involvement with the CIA. *See* Tr. at 210–212.

This infliction of extreme distress, which was intentionally caused by Sutherland's captors, is attributable to the defendants because the defendants substantially funded and controlled Hizbollah. *See* Section II.A. As such, the defendants are liable under the tort doctrines of *respondeat superior* and joint and several liability. *See*

*Flatow*, 999 F.Supp. at 26–27 (finding The Islamic Republic of Iran and the Iranian MOIS liable under the doctrines of *respondeat superior* and joint and several liability).

Thus, finding that Thomas Sutherland was indeed intentionally inflicted with emotional distress, and that the infliction is attributable to the defendants, the Court finds the defendants liable for the emotional distress of Sutherland.

 With respect to Jean Sutherland, the Court also finds that the defendants are liable for her emotional distress. First, there is no doubt that Mrs. Sutherland suffered significant emotional distress from the ordeal. She testified at length about how her husband's capture isolated her from both her husband and the rest of her family. See Tr. at 268. After her husband was captured, she decided to move to Beirut. She worked tenaciously for her husband's release, and as a result only returned to her family about once a year. *See* Tr. at 268. Thus, for a period of over six years, Mrs. Sutherland lived a life of isolation and dashed hopes. She repeatedly missed important family events, and suffered repeated anxiety attacks in her efforts to free her husband. *See* Tr. at 271–72. In summary, the Court has a doubt that Mrs. Sutherland suffered extreme emotional distress.

 Second, the Court finds that this distress was "intentionally or recklessly cause[d]." Restatement (Second) of Torts, § 46 (1986). Tort law is clear that one *intends* a consequence if a person has "in the mind a purpose (or desire) to bring about given consequences [and] also ... [has] in mind a belief (or knowledge) that given consequences are substantially certain to result from the act." Keeton et al., Prosser & Keeton on Torts, § 8, at 34 (5th ed.1983). Moreover, a person recklessly causes a consequence if that person acts

"in disregard of a known or obvious risk that was so great as to make it highly probable that [the consequence] would follow." Prosser & Keeton on Torts, § 34, at 213. The Court finds that, when an organization takes someone hostage, it is implicitly intending to cause emotional distress among the members of that hostage's immediate family. Further, the Court finds that an organization taking someone hostage implicitly believes that such emotional distress is substantially certain to result. These conclusions are based on the logical inference that a hostage without loved ones—that is, a hostage without those who will be emotionally distressed by his absence—is of no value at all to a hostagetaker. For without loved ones, there is nobody to pay for the hostage's release. And even if the hostage's country (rather than his family) pays for his release, a hostage's loved ones play a vital role in agitating for governmental action. Governments rarely remain complacent when such complacency could be actively exposed by a hostage's family.

But even if the defendants did not fully *intend* to cause Jean Sutherland emotional distress, the Court finds that the defendants acted in callous disregard of the obvious risk that such emotional distress would result. In other words, even if the defendants did not intend Mrs. Sutherland's distress, they recklessly caused it, and are therefore liable for it in the same way that the defendants are liable for Mr. Sutherland's emotional distress.

\* \* \* \* \* \*

Having found the defendants liable on the counts described above, the Court next proceeds to the calculation of damages.

### C. Damages

The Foreign Sovereign Immunities Act specifically permits plaintiffs suing under

section 1605(a)(7) to pursue "money damages which may include economic damages, solatium, pain, and suffering." 28 U.S.C. § 1605 note. After reviewing the arguments presented by the plaintiffs, and the law applicable thereto, the Court makes the following conclusions regarding damages.

### 1. Compensatory Damages

#### (a) Thomas M. Sutherland

■ Thomas M. Sutherland seeks compensatory damages for his battery, false imprisonment, emotional distress, economic loss, and loss of consortium. Based on the testimony presented in open court, the Court finds Mr. Sutherland entitled to the amount he has requested, $23,540,000.

Mr. Sutherland testified at length during the trial as to his daily suffering over an unconscionable 2,354 days. His experience is summarized in the Court's Findings of Fact. For his intense suffering, which ranged from lack of hygiene to loneliness to severe beatings, the Court awards Mr. Sutherland US$ 23,400,000.

In setting Mr. Sutherland's damages at this level the Court follows the formula which has evolved as a standard in hostage cases brought under section 1605(a)(7). This formula grants the former hostage roughly $10,000 for each day of his captivity. Thus, Terry Anderson, a co-hostage of Mr. Sutherland's who was detained slightly longer than Sutherland, was awarded $ 24,540,000. *See Anderson*, 90 F.Supp.2d at 113. Similarly, Joseph Cicippio, who was held hostage by Hizbollah for 1,908 days, received $20,000,000; Frank Reed, who was held hostage by Hizbollah for 1,330 days received $16,000,000; and David Jacobson, who was held hostage by Hizbollah for 532 days received $9,000,000. *See Cicippio*, 18 F.Supp.2d at 64, 70.

Any skepticism about the adequacy of this formula must overcome the steep presumption that Congress has tacitly approved its use. In all of the above cases, the formula was developed and applied *prior* to October 28, 2000. On that day, Congress enacted the Victims of Trafficking and Violence Protection Act of 2000. The Act obligated the United States Treasury to pay terrorist victims—including the hostages described above—the amount awarded them at trial, or in other words, about $10,000 per day of captivity. Congress must be presumed to have aware of the damages formula, and its failure to amend it in any way amounts to a tacit approval of the scheme. *See Flood v. Kuhn*, 407 U.S. 258, 283–284, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (declining to overturn prior precedent where Congress "by its positive inaction" has allowed prior decisions to stand). Thus, this Court finds the $23,540,000 to be an appropriate award for Thomas M. Sutherland.

#### (b) Jean Sutherland

■ Jean Sutherland seeks compensatory damages for her emotional distress, loss of consortium, and solatium. Although Mrs. Sutherland's suffering is summarized above in the Court's Findings of Fact, it should be noted here that she withstood extensive loneliness, psychological isolation, and anxiety. Based on this suffering, the Court finds Mrs. Sutherland entitled to US$ 10,000,000.

Like the calculation of Mr. Sutherland's damages, the Court's calculation of Mrs. Sutherland's damages is guided by previous cases dealing with substantially the same events. In *Anderson v. The Islamic Republic of Iran*, Terry Anderson's wife received $10,000,000, as did the wives of hostages Joseph Cicippio and Frank Reed in *Cicippio v. The Islamic Republic of Iran. See Anderson*, 90 F.Supp.2d at 113;

*Cicippio,* 18 F.Supp.2d at 70. Further, the Court relies on its analysis of solatium damages in *Flatow v. The Islamic Republic of Iran,* 999 F.Supp. at 29–32. All of these factors, taken together with Congress' tacit approval of previous damage calculations, suggest that Jean Sutherland's demand of $10,000,000 is merited.

### (c) Ann Elizabeth Sutherland, Katherine Lee Sutherland, and Joan Murray Sutherland

■ Thomas Sutherland's three daughters seek solatium damages for their six-and-a-half years of suffering. Their suffering, which consisted of extensive anxiety, frustration, and loneliness is summarized in the Court's Findings of Facts listed above. Based on this suffering, the Court finds that each daughter is entitled to the amount requested, $6,500,000.

Besides being supported by the evidence presented in court, the Court's calculation of damages is consistent with previous awards in substantially similar cases. For instance, in *Flatow,* the Court awarded $2,500,000 to each of sibling of a bombing victim for the suffering they had undergone. *See* Flatow, 999 F.Supp. at 32. Similarly, in *Anderson,* the court awarded Terry Anderson's daughter $1 million for each year Anderson was held hostage. Thus, Sulome Anderson was awarded $6,700,000. *See Anderson,* 90 F.Supp.2d at 114. Like the above damage calculations, these calculations can be considered tacitly approved by Congress in its October 28, 2000 enactment of the Victims of Trafficking and Violence Protection Act of 2000.

### 2. Punitive Damages

■ The Court is finally faced with issue of whether punitive damages should be levied against the defendants. According to the Restatement (Second) of Torts, such damages are merited in cases involving "outrageous conduct." *See* Restatement (Second) of Torts, § 908(1) (1965). In the case at hand, the Court has little hesitation finding that the depraved and uncivilized conduct of the Iranian MOIS qualifies as outrageous conduct.[6] It stole a human being from his family and-for over six years-blindfolded him, chained him, beat him, and deprived him of adequate food, clothing, and medical care. Such treatment is the height of barbarism. Indeed, in most civilized nations, it is unlawful to treat even a stray dog in such manner.

■ Thus, finding that punitive damages are merited, the court proceeds to determine the appropriate amount. In determining the level of punitive damages to impose, a court is to look at four factors: "the character of the defendant's act; the nature and extent of harm to plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." *Flatow,* 999 F.Supp. at 32 (citing Restatement (Second) of Torts § 908(1)-(2) (1977)). With regard to the first factor, the Court has just noted the exceedingly heinous nature of the Iranian MOIS's acts. With regard to the second factor, the far-reaching and long-lasting damages caused by these acts were explained above in the Court's Finding of Facts.

With regard to deterrence, there is a mixture of opinion whether a monetary penalty from a United States court will have a deterrent effect on the Iranian MOIS's behavior. Some argue that the

---

**6.** Defendant Iranian MOIS, as an "agency or instrumentality" is liable for punitive damages under 28 U.S.C. § 1606. *See also* *Anderson,* 90 F.Supp.2d at 114. The plaintiffs decline to seek punitive damages against The Islamic Republic of Iran.

Iranian MOIS operates in an extrajudicial world, and that judicial penalties will therefore be ineffectual; others argue that the MOIS's extrajudicial behavior is exactly the reason to levy greater and greater penalties on them. A third view was proffered by Dr. Clawson at trial: the failure to impose substantial punitive damages after several previous impositions might be construed by MOIS as a capitulation by the United States in the debate over the legitimacy of hostage-taking. As such, the failure to impose punitive damages might actually be construed as a condonation of MOIS's rogue behavior. *See* Tr. at 74.

Finally, with regard to the wealth of the defendant, the Court finds the defendant quite wealthy. As explained above, the Iranian MOIS has approximately 3000 employees and is the largest spy organization in the Middle East. The organization is heavily funded by the Iranian government. As Dr. Clawson testified at trial, the Iranian government funnels most of its terrorist dollars, somewhere near $100 million, through the Iranian MOIS. *See* Tr. at 61. Thus, at the very minimum, the organization is funded in the hundreds of millions.

The Court, guided by Dr. Clawson's expert opinion as well as previous decisions on substantially similar cases, finds $300,000,000 in punitive damages to be merited. That amount is thrice the annual funding provided by the Iranian government to MOIS. Not only is Dr. Clawson's expert opinion persuasive, the Court is not at all convinced that punitive damages are wholly ineffectual. Previous cases awarding punitive damages against MOIS have only been decided in the past three years. Since that time, there have been no reported hostage incidents involving Hizbollah and United States nationals. Further, it is doubtful that the full punitive effect of the fine has yet taken hold. The process of collecting an international debt is a long and laborious process, and it is therefore quite possible that the deterrent effect of the fines has yet to be fully felt.

Further, $300 million is an amount consistent with the punitive damages levied several times in the past. *See Anderson,* 90 F.Supp.2d at 114 (awarding $300 million in punitive damages against MOIS for the kidnapping and detention of Terry Anderson); *Flatow,* 999 F.Supp. at 34 (awarding $225 million—three times Iran's reported expenditure on terrorist activities—to the estate of a terrorist victim).

## III. CONCLUSION

Today's holding is not a foreign policy edict; rather it is an edict on the rule of law. It is an edict that reaffirms the unflinching principle that those who intentionally harm United States nationals will be held accountable for that harm in United States courts.

Thus, for the foregoing reasons, the Court finds that defendants are liable for the injuries inflicted on Thomas M. Sutherland and his family. The defendants shall be jointly liable for the following compensatory damages:

| | |
|---|---|
| Thomas M. Sutherland | US$ 23,540,000 |
| Jean Sutherland | US$ 10,000,000 |
| Ann Elizabeth Sutherland | US$ 6,500,000 |
| Katherine Lee Sutherland | US$ 6,500,000 |
| Joan Murray Sutherland | US$ 6,500,000 |

Further, the Iranian Ministry of Information and Security shall be liable to Thomas M. Sutherland for US$ 300,000,000 in punitive damages. A separate order consistent with this Opinion shall issue this date.